UNPUBLISHED

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

ELIZABETH A. EDMONDS,
Plaintiff-Appellant,

v.

No. 97-1431

HUGHES AIRCRAFT COMPANY;
HARTFORD LIFE & ACCIDENT
INSURANCE COMPANY,
Defendants-Appellees.

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Robert E. Payne, District Judge.
(CA-96-1368-A)

Argued: December 1, 1997

Decided: May 8, 1998

Before WILKINS, NIEMEYER, and MICHAEL, Circuit Judges.

_____

Affirmed in part, reversed in part, and remanded with instructions by
unpublished per curiam opinion. Judge Niemeyer wrote a dissenting
opinion.

_____

**COUNSEL**

**ARGUED:** Jon Michael Lippard, JON M. LIPPARD, P.C., Alexan-
dria, Virginia, for Appellant. Alfred Francis Belcuore, II, MONTE-
DONICO, HAMILTON & ALTMAN, P.C., Washington, D.C., for
Appellees.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Elizabeth Edmonds appeals a summary judgment entered for the defendants, Hughes Aircraft Company (Hughes) and Hartford Life and Accident Company (Hartford), in Edmonds' suit challenging the denial of disability benefits under an ERISA[1] welfare benefit plan. We affirm in part, reverse in part, and remand with instructions to award benefits to Edmonds.

I.

Elizabeth Edmonds was an executive secretary for Hughes for fifteen years. For all of her life, she has suffered from minor depression, and she has been treated for it for several years. Until the period at issue here, her depression had not prevented her from performing her usual duties for Hughes.

In mid-1993 Edmonds' mother became gravely ill, and, more or less simultaneously, she was assigned a new supervisor at work. According to Edmonds, her new supervisor was not sympathetic to her need for occasional time off to care for her mother. The supervisor yelled at and often humiliated her.[2] Edmonds' depression grew steadily worse. Her mother died, and the abuse at work continued. By July 1994 she could take it no longer, and she stopped working. Her treating psychiatrist, Dr. Barry Gorman, and her counselor, Catherine Thomsen,[3] agreed that her depression precluded her from continuing her current work.

_____

[1] Employee Retirement Income Security Act, 29 U.S.C. §§ 1001 et seq.
[2] If Edmonds' account be true, the supervisor's comments reached a shocking level of cruelty. For example, after Edmonds returned from an absence to care for her mother, the supervisor said,"maybe after the next stroke, she'll roll over and die."
[3] Ms. Thomsen is a licensed clinical social worker.

Edmonds filed a claim for disability benefits under two welfare benefit plans maintained by Hughes. The plans provide for short-term disability benefits (STD) for a maximum of 180 days and long-term disability benefits (LTD) for up to 24 months.[4] Hughes is nominally the administrator of both plans, but all discretion usually resident in the administrator is vested in Hartford. Hartford's possession of this discretion causes it to be a fiduciary of the plans. 29 U.S.C. § 1002(21)(A)(i), (iii). Though the documents in the joint appendix do not reveal details of the financial arrangement between Hartford and Hughes, their counsel conceded at oral argument that Hartford was not paid merely a fee for administrative services; instead, Hughes paid a premium to Hartford to both administer the plans and to cover benefit payments.

There are some minor differences between the plans, but none of relevance here. Both grant Hartford the "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and conditions" of the Hartford policy that funds each plan. Each covers disability caused by mental illness of the type alleged by Edmonds, and both define "total disability" as occupational disability, that is, the inability to perform one's customary job, rather than the inability to perform any job. See DeWitt v. State Farm Insurance Companies Retirement Plan, 905 F.2d 798, 802 (4th Cir. 1990).

Based on information it received from Dr. Gorman and Ms. Thomsen, Hartford approved STD benefits for Edmonds for the entire 180 days authorized by the STD plan.[5] Meanwhile, it began to process Edmonds' LTD claim.

In a "request for nursing review" dated October 18, 1994, a Hartford employee stated, "In an effort to deter[Edmonds] from LTD, I believe this situation can possibly result in a joint effort (over!)." Unfortunately, the other side of the page is not in the record, so we cannot with certainty identify the parties to the"joint effort" to deter Edmonds or the particular efforts proposed.

---

[4] The 24-month period applies to mental illness only. Employees disabled for other reasons may be eligible for benefits for a longer period.
[5] Edmonds did not begin receiving actual cash benefits, however, until her paid sick leave was exhausted on October 14, 1994.

On December 22, 1994, Wanda Dorgan of Hughes' legal department contacted Sandy Lathe, a claims examiner at Hartford. She informed Lathe that Edmonds had just sued Hughes for"disability discrimination." Lathe told Dorgan that STD had been approved for the full 180 days, but that Edmonds' claim for LTD was still being evaluated. According to Edmonds, this conversation suggests that Hughes was applying subtle (or not so subtle) pressure on Hartford to deny the claim. Edmonds contends that this pressure succeeded.

As a matter of policy, neither Dr. Gorman nor Ms. Thomsen releases private office notes. During the processing and approval of Edmonds' STD claim, this policy had not posed a problem. Dr. Gorman and Ms. Thomsen responded to Hartford's inquiries, and their responses had apparently been sufficient for Hartford to evaluate the claim. On February 9, 1995, Sandy Lathe discussed Edmonds' LTD claim with someone identified only as "Cathy." Lathe's notes state that "[n]either of Ms. Edmonds['] doctors will release office notes to review the patient[']s condition. However, they have answered the questions we've posed." Lathe and Cathy discussed the situation and concluded that Hartford did not have enough information to make a decision. Consequently, they decided to obtain an"independent medical examination" of Edmonds.

Hartford had Comprehensive Rehabilitation Associates (CRA), a California firm, arrange for the independent medical examination. CRA engaged Dr. Bruce Smoller of Fairfax, Virginia, for the task. As instructed by Hartford, CRA asked Dr. Smoller to provide a "fair and impartial narrative report addressing" these matters:

1. The patient's pertinent medical history.

2. Subjective symptoms reported by the patient.

3. Objective findings found by the examiner.

4. The examiner's diagnosis of the condition(s) which disable (or are claimed to disable) the patient.

5. What are the patient's specific physical or psychiatric limitation(s)? Please be sure to itemize all limitations.

4

6. What is the expected duration of these limitations?

7. Do you agree with the patient's present course of treatment? What, if any, other treatment would you recommend and what would you expect to be the result of such treatment?

8. Please limit your discussions to the medical limitations, not vocational limitations of the claimant.

Dr. Smoller interviewed Edmonds on March 16, 1995. According to Edmonds, the interview lasted no more than forty-five minutes. In a report dated March 16, 1995, but not stamped "received" by Hartford until April 3, 1995, Dr. Smoller concluded:

(1). Ms. Edmonds does suffer from some psychiatric symptoms of dysthymia, that is: a rather low-grade depression and dissatisfaction with life, symptoms of anxiety that have persisted throughout her life, a tendency to physicalize or somatize her stress (to present physical symptoms which are related to the stress).

These are lifelong problems, unrelated in the main to any outside activity although she is probably hypersensitive to criticism.

(2). These problems are unrelated to work activities. The stressors she describes at work seem not to be unduly discriminatory or unreasonable for a supervisory relationship. This patient seems to have taken a great deal of time off of work and it would be reasonable for the supervisor to question such.

(3). Although this patient does have longstanding psychiatric problems, they are personality-based, have existed by the patient's own admission and by history, since childhood or early adolescence and are not related to current work-related activities.

5

(4). This patient is not disabled by these conditions. Although she probably is in need of psychiatric treatment and medications, there is no clear indication of an inability to work. The problems she describes are in the administrative realm, not the medical, and should be resolved in that arena. On a psychiatric basis, Ms. Edmonds is not disabled from work and while it is commendable that she is seeking treatment, her symptoms do not prevent her from productive functioning.

The patient has no specific physical or psychiatric limitations at the current time. It may be in everyone's best interest to transfer her to a different position at Hughes if this is possible but my suspicion is that she will find some problem with her next supervisor based on the hypersensitivity that she evidences in her personality.

5 Patient's present course of treatment is not unreasonable although it has gone on for seven years without terribly much change. Ms. Edmonds, however, has no medical or psychiatric limitations which would prevent her from functioning adequately in the positions for which she is trained.[6]

Lathe spoke to Edmonds by telephone on the day this report was received by Hartford. She told Edmonds that she would be recommending that the claim be denied based on Dr. Smoller's report. Lathe's supervisor agreed, and written denial of the claim was mailed to Edmonds on April 5. Simultaneously, Hartford sent a copy of Dr. Smoller's report to Dr. Gorman for his comments.

Edmonds prepared an eight-page, handwritten response to Dr. Smoller's report. Among other things, she asserted that (i) Dr. Smoller had erroneously posited that the severity of her symptoms had not changed through her lifetime, (ii) his opinion that she would "find some problem with her next supervisor" was belied by her positive

---

[6] The differences in this paragraph's format are discussed in Section III below.

relationship with the majority of her twenty-one prior supervisors at Hughes, and (iii) he had mentioned to her that he would provide his findings to her lawyer, though she was not represented by counsel at the time.[7]

But soon she was. On June 14, 1995, her lawyer formally appealed the denial of LTD benefits, and, on July 6, 1995, he forwarded a report by Edmonds' therapist Catherine Thomsen. Ms. Thomsen recounted what she had observed during seven years of treating Edmonds and the incidents that led up to Edmonds leaving work. Thomsen continued:

> As time went on in 1993 and 1994, Mrs. Edmonds became increasingly despondent as the tension with her boss magnified in scope. She began to experience serious sleep disturbances, sometimes not sleeping for days at a time. When she did sleep, her sleep was fitful and marked by frequent nightmares involving her stressful situation at work. I observed her becoming increasingly agitated and tearful, sometimes shaking uncontrollably.

\* \* \*

> By the spring of 1994, Mrs. Edmonds was suffering from severe depression, fatigue and anxiety. She was unfocused, unable to concentrate, not sleeping, not eating and had withdrawn socially. I felt that she was clearly headed for a nervous breakdown if she did not stop working at the time. She remains unstable but is able to minimally function having been able to distance herself from the trauma she experienced with her manager. She feels very humiliated by these incidents at work and let down by her co-workers who were told to stay away from her. To this day when we discuss her returning, she becomes inconsolable.

_____

[7] Of course, she had a lawyer in her discrimination suit against Hughes, but the "independent medical examination" was not commissioned for use in that suit.

7

With regard to Dr. Smoller's report, I agree that Mrs. Edmonds has had a life long history of depression. However, it has never incapacitated her until this present situation with her boss.... Mrs. Edmonds remains seriously depressed and[,] in my opinion, is not capable of returning to office work for an extended period of time.

On July 28, 1995, Dr. Gorman also offered a report supporting Edmonds' claim. He explained that Edmonds had been referred to him in 1992 by Ms. Thomsen when Edmonds' previous psychiatrist had moved from the area. He recounted her long history of moderate dysthymia and the abrupt worsening brought about by her mother's terminal illness and her conflict with her new boss.

As the result of these two stressors Ms. Edmonds demonstrated a much more significant degree of psychopathology. Her depression became significantly worse. She went from experiencing a Dysthymic Disorder to a Major Depressive Episode. Her depression was characterized by insomnia, hypersomnia, lethargy, a loss of interest and pleasure in previous activities, tearfulness, anorexia, social withdrawal, suicidal ideation, difficulty facing the day and functioning, and frequently experiencing a sensation of being swallowed up by a black hole. Although she did not experience all of these symptoms all of the time, they are clearly characteristic of her affective experience over the past several years.

Ms. Edmonds experienced an Anxiety Disorder analogous to Post-Traumatic Stress Disorder. Her symptoms were severely exacerbated by thoughts of work, discussion of work, or the need to attend her work environment. She experienced tremendous apprehension, anxiety, dread, fearfulness, and nightmares. She also had frequent remembrances of traumatic experiences with her boss.

Though Dr. Gorman clearly disagreed with Dr. Smoller, he expressed this disagreement diplomatically:

Ms. Edmonds was seen for a psychiatric examination by Dr. Smoller. He was placed in the difficult position of evaluat-

8

ing a very complicated situation in a short amount of time with limited information. Mrs. Thomsen and I have had the experience of working with Ms. Edmonds over the past several years. We have been able to follow her course and understand the entire situation. She is a very troubled woman suffering from a number of co-morbid conditions and clearly unable to work at this time and most likely for an indefinite future period. She is functioning at a level of psychopathology much more severe and serious than prior to the death of her mother and her traumatic experience at work. I do not feel Dr. Smoller's report takes into consideration the severity and seriousness of her current situation, or the full impact of these stressors on her emotional state. Ms. Edmonds is currently unable to work. She has been disabled from working for at least the past two years. When and if she can return to meaningful employment cannot be determined at this time.

After yet another request from Hartford, Edmonds was able to persuade Dr. Gorman to release his office notes. These were sent to Hartford on September 21, 1995. On October 2, Hartford acknowledged receipt of the notes and advised that they had been sent to "our medical department for review."

A "Claim Division Summary Report" dated October 11, 1995, states that the medical staff "reviewed these records and have [sic] found `there are no changes in [Edmonds'] chronic dysthemia [sic] to support limitations and unable [sic] to do job. No evidence of any distinct change to produce symptoms of disabling nature.'" The document from which these conclusions were apparently quoted is not in the record. On October 18, 1995, Hartford denied the appeal based on the assertion that Dr. Gorman's notes supported Dr. Smoller's view. No explanation of this purported support was given.

Edmonds filed yet another appeal in November. She submitted another report from Dr. Gorman. He flatly stated,"Elizabeth Edmonds is currently disabled. She is unable to perform the material and substantial duties of her regular occupation." He described her symptoms and reiterated that they were trauma-induced and of greater

severity than her life long dysthymia. The charitable tone of his ear-
lier critique of Dr. Smoller's opinion was gone:

> The letter from ITT Hartford says that in order to qualify
> for benefits medical evidence substantiating total disability
> must be provided. I believe that medical evidence was pro-
> vided. Unfortunately this evidence was ignored and dis-
> torted by those who did the "concluding." The two people
> who know her the best, have worked with her the longest,
> and are most familiar with her psychological state, both feel
> that she is clearly disabled. I am referring to Mrs. Thomsen
> and myself. We are both respected and licensed clinicians.
> However, it appears that our assessment and recommenda-
> tions are being ignored.

> I feel Dr. Smoller's evaluation was inaccurate and biased.
> He could not accurately evaluate this complicated history
> and situation in one visit. It does not appear to me that he
> fully took into consideration the information provided by
> Mrs. Thomsen and myself.

Hartford promptly responded in a letter stating that "Dr. Gorman's
most recent report . . . does not offer the medical documentation
needed to render a different decision on this claim." However, Hart-
ford announced that it had decided to send "all available medical
records" to the "Medical Review Institute" for a "second opinion."[8]

The Medical Review Institute of America, Inc. (MRI) is a Utah-
based subsidiary of Medical Opinions, Inc. It provides opinions
"solely for the purpose of claims adjudication by[its] clients[.]"
Though an MRI opinion is prepared by a physician, the identity of the
preparer is not disclosed.

On December 27, 1995, MRI sent Hartford its report concerning
Edmonds. Here is the substantive portion of the one-page report:

_____

[8] Edmonds points out that the term "second opinion" implies that Hart-
ford was only counting one other, and that it takes little analysis to iden-
tify which one.

10

All of the submitted records were reviewed. Based on the medical records provided, in my opinion, the patient is not disabled because of psychiatric reasons.

I concur with statements made by Dr. [Smoller] in the psychiatric report dated 3/16/95 to the effect that,"there is no clear indication of an inability to work. The problems she describes are in the administrative realm, not the medical, and should be resolved in that arena."

Also of significance in Dr. [Smoller's] report was the discussion of the finding in an "MMPI" that was reportedly done, which noted that (the patient) "... may attempt to control others by complaining of physical symptoms," and later noted, "she is likely to have a hysterical adjustment to life which under stress may produce or exacerbate symptom development leading to a pattern of invalidism."

Along with its opinion, MRI sent Hartford a bill for $472 and an advertisement for a "new cost-saving service" involving review of invoices from hospitals for DRG (diagnostic-related groups) services. Interested insurers were directed to MRI's Marketing Department at a toll-free number.

By letter dated January 6, 1996, Hartford again denied Edmonds' claim. On February 13, 1996, Edmonds tried one last time. She filed another appeal and submitted additional evidence: the determination of the Social Security Administration that she was disabled from returning to her past work (though not to all work) and the report of Dr. Robert Altman, who had examined her on April 27, 1995, in connection with her Social Security claim and had corroborated Dr. Gorman's diagnosis of major depression. Hartford reiterated its denial of her claim on March 4, 1996.

This litigation followed. On September 25, 1996, Edmonds sued Hughes and Hartford in district court. She sought enforcement of her contractual right to LTD benefits and damages for breach of fiduciary duty. After discovery the defendants moved for summary judgment. A hearing was held on March 14, 1997, at which the district court granted the motion from the bench.

11

Edmonds appeals.

II.

We review the grant of summary judgment <u>de novo</u> . <u>Brogan v. Holland</u>, 105 F.3d 158, 161 (4th Cir. 1997). Review of an ERISA plan administrator or fiduciary's decision is also <u>de novo</u>, except where the plan grants the administrator or other fiduciary discretion concerning the decision at issue. In the latter event, we review for abuse of discretion. <u>Firestone Tire & Rubber Co. v. Bruch</u>, 489 U.S. 101 (1989). In an ordinary abuse of discretion case, we must affirm the fiduciary's decision if it "`is the result of a deliberate, principled reasoning process and . . . is supported by substantial evidence.'" <u>Brogan</u>, 105 F.3d at 161 (quoting <u>Bernstein v. CapitalCare, Inc.</u>, 70 F.3d 783, 788 (4th Cir. 1995)).

An ERISA fiduciary must act "solely in the interest of the participants and beneficiaries[.]" 29 U.S.C. § 1104(a)(1)(A). In exercising any discretion granted by the plan, the fiduciary may take the interests of all of the plan participants into account, one of which is to conserve the plan's assets. <u>Ellis v. Metropolitan Life Insurance Co.</u>, 126 F.3d 228, 234 (4th Cir. 1997). In an insurer-funded, insurer-fiduciary plan, this legitimate consideration can be very difficult to distinguish from the wholly illegitimate consideration of the insurer's own profits. After all, once the premium is paid, the plan is "fully funded" in the sense that the risk of unanticipated expenses is shifted from the plan's sponsor and beneficiaries to the insurer. A fiduciary that bears such a risk and simultaneously has the discretion to lessen it has a direct conflict of interest.**9**

ERISA tolerates the existence of this conflict of interest, but it does not tolerate any adverse consequence to plan beneficiaries. As we noted earlier, the fiduciary must act <u>solely</u> in the interest of the plan's participants and beneficiaries. Therefore, though we review all discre-

_____
**9** The record does not reveal whether Hartford has any power to recoup unanticipated losses from Hughes through premium adjustments in subsequent years or any absolute right to renewal in order to exercise such a power. In any event, defendants' counsel conceded at argument that we may assume that Hartford had a conflict of interest.

12

tionary decisions for abuse of that discretion, we subject decisions made by fiduciaries with conflicts of interest to a "sliding scale" of additional scrutiny.

> The more incentive for the administrator or fiduciary to benefit itself by a certain interpretation of benefit eligibility or other plan terms, the more objectively reasonable the administrator or fiduciary's decision must be and the more substantial the evidence must be to support it.

Ellis, 126 F.3d at 233. We must do this even though there may be no evidence of a deliberate consideration of the fiduciary's self-interest, and our decision in a given case that the fiduciary's discretion has been abused does not necessarily imply that there was such deliberate consideration.

> Even the most careful and sensitive fiduciary in those circumstances may unconsciously favor its profit interest over the interests of the plan, leaving beneficiaries less protected than when the trustee acts without self-interest and solely for the benefit of the plan.

Doe v. Group Hospitalization & Medical Services, 3 F.3d 80, 86-87 (4th Cir. 1993).

We reiterate: because ERISA guarantees plan beneficiaries a fiduciary who acts solely in their interests, a fiduciary laboring under a conflict of interest "must act as if he is `free' of such a conflict." Bedrick v. Travelers Insurance Co., 93 F.3d 149, 154 (4th Cir. 1996). "`Free' is an absolute. There is no balancing of [the beneficiaries' and either the fiduciary's or a third party's] interests; ERISA commands undivided loyalty to the plan participants." Id.

If faithfully discharging such a duty appears especially arduous, that is because it is. In general, Congress intended ERISA's fiduciary responsibility provisions to be a codification of the common law of trusts, Firestone, 489 U.S. at 110, and the duties of care and integrity demanded of a fiduciary were among the highest, if not the very highest, known to the common law. Justice Cardozo provided their most memorable description:

13

> Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the "disintegrating erosion" of particular exceptions. Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd. It will not consciously be lowered by any judgment of this court.

Meinhard v. Salmon, 249 N.Y. 458, 164 N.E. 545, 546 (1928) (citation omitted). We could not say it as well, but we are of like mind. So, with these principles before us, we turn to the facts of this case.

III.

The first and most obvious thing one notices about the decision on review is that it is discernibly against the weight of the evidence. We think that most, if not nearly all, disinterested decisionmakers would give greater weight to the opinions of two treating therapists of long standing (neither of whom were hired in connection with the filing of the claim) over the first impression of another expert, who had conducted a single short interview and whose opinion belies perhaps too great a familiarity with its intended purpose (see below).

The second and most disturbing thing one notices is that there are a couple of things in the record one would not expect to see from a fiduciary possessing "the punctilio of an honor the most sensitive[.]"

The first of these is the October 18, 1994, "request for nursing review." A disinterested fiduciary evaluates claims as they come in and lets the chips fall where they may. Planning to "deter" a beneficiary from seeking benefits would not occur to such a fiduciary, let alone proposing some sort of "joint effort" to effect the deterrence.

14

The other item of concern is the possible influence Hughes[10] had on Hartford's decision. It is just as violative of an ERISA fiduciary's duties to further the interests of a third party as to further its own.[11] Unlike the "request for nursing review," there is no smoking gun on this point, but there is at least a cloud of suspicion. We do know that Hughes' legal department informed Hartford of Edmonds' discrimination lawsuit, and we think that there was only the most marginal legitimate reason for it to do so. In their brief Hughes and Hartford assert that "this litigation, and the claims Ms. Edmonds made in it, obviously were relevant to Ms. Edmonds' psychiatric disability[.]" Brief of Appellees, at 43-44. It was "obviously relevant" in the broadest legal sense -- being party to a pending lawsuit is surely stressful -- but one must doubt if this "relevant" purpose was the one for which Hughes offered it.

The lining for this cloud of suspicion is supplied by Dr. Smoller's report. First of all, its form seems odd. The report takes up four single spaced pages, a few lines on a fifth page, and then a one-paragraph addendum. Nearly all of the doctor's conclusions are on page four. This page has a different header than the others, [12] and it and the

_____

[10] We speak here of Hughes as employer-defendant in Edmonds' discrimination lawsuit, not of Hughes as plan fiduciary.

[11] See **Central States, Southeast and Southwest Areas Pension Fund v. Central Transport, Inc.**, 472 U.S. 559, 571 n.12 (1985) (if goal of plan trustees' audit request was to acquire information for third-party labor union's use, ERISA's "standard of loyalty" would be violated).

[12] Page 1 is unnumbered. Pages 2, 3, and 5 are all headed in this style:

> Re: Elizabeth Edmonds
> March 16, 1995
> Page [Two, Three, or Five]

page 4 has this header:

> RE: Elizabeth Edmonds
> Page Four

and the addendum has this one:

> ADDENDUM
> Page One
> RE: E. Edmonds.

15

addendum are printed in an different font than pages one, two, three, and five. Paragraph five of Dr. Smoller's conclusions does not appear on page four, and, as one can glean from our quotation of the conclusions in Part I above, it is numbered and indented differently. A skeptic might suspect that the report as it appears in the record was not prepared at one time and in one place.

The substance of the report also raises eyebrows. All of paragraph two and parts of paragraphs three and four are devoted to minimizing and justifying the severity of the stress experienced by Edmonds at work and, in general, to breaking any causal link between Edmonds' problems and her job. Indeed, Dr. Smoller went so far as to opine not just that the pressure put on Edmonds by her supervisor was not "unreasonable," but also that it was not "discriminatory."

Of course, the LTD plan simply provides benefits for disability; the beneficiary need not show that the disability is her employer's fault, or anyone else's fault for that matter.[13] One can search in vain through the instructions CRA forwarded to Dr. Smoller from Hartford for any request that the doctor give his opinion concerning the appropriateness of Hughes' workplace from an employment relations standpoint. His decision to render such an opinion at some length suggests the presence of improper influence from Hughes.

Does MRI's report remedy these concerns? No. We wonder whether a conflict-free ERISA fiduciary would even spend $472 of the plan's money for a terse, conclusory opinion by a non-examining, anonymous physician, let alone rely upon it over the opinions of treating physicians. There is no way to ascertain what particular information the MRI report author considered -- beyond Dr. Smoller's report, that is. The physician's anonymity makes assessment of his credibility all but impossible; in fact, we must take MRI's word for it that the report was even prepared by a physician. In any event, we

_____

[13] Moreover, even if the level of stress Edmonds experienced was not "unreasonable" for some objective rugged individualist, it may well have been devastating to a woman suffering from chronic depression and simultaneously watching her mother die a slow death. Mental illness may often be characterized by irrational, unreasonable affective responses to day-to-day stress.

do know that MRI markets its expertise in assisting insurance companies in reducing liability payments.

Hartford labored under a conflict of interest in evaluating Edmonds' claim. We are unable to assure ourselves that Hartford in fact acted as if it were free of such a conflict, and we believe that a rational fiduciary without a conflict would surely have awarded Edmonds LTD benefits. We therefore hold that the denial of benefits was an abuse of discretion.

IV.

Finally, we must address Edmonds' claim of breach of fiduciary duty. While ERISA authorizes suits "by . . .[a] beneficiary . . . for appropriate relief under § 1109 of this title[,]" 29 U.S.C. § 1132(a)(2), and § 1109 is entitled "Liability for breach of fiduciary duty," such a suit will only lie to remedy injuries to the plan as a whole rather than to an individual beneficiary. Massachusetts Mutual Life Insurance Co. v. Russell, 473 U.S. 134, 140-141 (1985). Edmonds' complaint does not seek damages for the plan.

However, the Supreme Court has recognized that, under limited circumstances, a beneficiary may sue for breach of fiduciary duty under § 1132(a)(3) (authorizing suits for"appropriate equitable relief" redressing or enjoining violations of the chapter). In Varity Corp. v. Howe, 516 U.S. 489 (1996), the beneficiaries of a welfare benefit plan were more or less duped by the plan's fiduciaries into giving up their benefits. The Court held that reinstatement was"appropriate equitable relief" to redress the breach of fiduciary duty.

The Varity Corp. Court was well aware that its holding could be construed to provide an additional cause of action, as a matter of course, to every beneficiary challenging a denial of benefits by his plan's fiduciary. Consequently, it issued this caveat:

> [W]e should expect that where Congress elsewhere provided adequate relief for a beneficiary's injury, there will likely be no need for further equitable relief, in which case such relief normally would not be "appropriate."

17

516 U.S. at 515. Congress has provided Edmonds an action to recover the benefits due her, § 1132(a)(1)(B), and, in the court's discretion, for a reasonable attorney's fee and costs. § 1132(g). Congress gave no more, however, "and we are not to give with the judicial hand what Congress has failed to provide in legislation." Coyne & Delany Co. v. Blue Cross & Blue Shield of Virginia, Inc., 102 F.3d 712, 716 (4th Cir. 1996). Inasmuch as neither her complaint nor brief identifies any defect in this relief severe or unusual enough to render an equitable supplement "appropriate" in the limited sense intended by Congress, Edmonds' § 1132(a)(3) claim must fail.

V.

The judgment of the district court on Edmonds' claim for breach of fiduciary duty is affirmed, but judgment on her claim for benefits due her under the plan is reversed. The case is remanded for calculation of damages due Edmonds and for the district court to exercise, in the first instance, its discretion to award or deny costs and an attorney's fee under 29 U.S.C. § 1132(g).

AFFIRMED IN PART, REVERSED IN PART,
AND REMANDED WITH INSTRUCTIONS

NIEMEYER, Circuit Judge, dissenting:

Elizabeth Edmonds, who suffers from depression, was awarded short-term disability benefits under an employee welfare benefit plan sponsored by her employer, Hughes Aircraft. The plan's administrator, however, denied her long-term benefits based on conflicting reports about the seriousness of the condition. This case challenges the plan's decision.

The majority opinion, overtly sympathetic with Edmonds' condition, reverses the plan's decision and awards Edmonds benefits. I believe that its approach in doing so failed properly to follow the discipline imposed by our standard of review in cases such as this one.

The only question in this case is whether Hughes Aircraft (and Hartford, its insurer) abused its discretion in refusing to provide an

18

employee benefit to Edmonds as promised in the language of its employee welfare benefit plan when the plan designates the benefit as a matter within the plan administrator's discretion. In such matters of contractually retained discretion, we must, as a matter of contractual interpretation, defer to the employer's discretion in determining whether the benefit must be given. See Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 111, 115 (1989); Sheppard & Enoch Pratt Hosp. v. Travelers Ins. Co., 32 F.3d 120, 124 (4th Cir. 1994). The majority opinion, I respectfully submit, misses this structural premise and, instead, appears to convert the welfare benefit plan into a presumed entitlement governed by strict common law fiduciary standards.

It must be remembered that ERISA does not mandate employee benefits of the type claimed by Edmonds. Rather, the statute provides a structure for the administration of plans that are contractually provided. ERISA does mandate that in administering a plan, the plan fiduciaries act solely in the interest of the participants and the beneficiaries. See 29 U.S.C. § 1104(a)(1). But that requirement does not prohibit an employer from retaining discretion in making judgment calls about the benefits it has agreed to provide so long as that discretion is expressed in the plan. Moreover, when such discretion is retained by a fiduciary, the fiduciary's decisions are not subject to review except for abuse of discretion. See Firestone, 489 U.S. at 111. When reviewing for abuse of discretion, we do not disturb a fiduciary's reasonable judgment "even if we come to a different conclusion independently." Doe v. Group Hospitalization & Med. Servs., 3 F.3d 80, 85 (4th Cir. 1993). We determine only whether the plan confers discretion on the fiduciary, whether the fiduciary acted within the scope of the discretion, and whether the fiduciary's decision was rational. See Haley v. Paul Revere Life Ins. Co. , 77 F.3d 84, 88-89 (4th Cir. 1996).

The majority opinion suggests that a conflict of interest might exist in this case to reduce the deference contractually demanded. But there is no evidence in the record to support this suggestion. At most, the majority opinion notes that because Hughes Aircraft pays a premium to Hartford to provide benefits and plan administration, they both save money if a claim is denied. That, however, is true in every case because benefits are not free. If the employer chooses to save yet

19

more money, it can withdraw the plan altogether. We have noted that this general level of conflict is inherent in any employment plan structure, even though such a conflict might be intolerable for trustees at common law. See Doe, 3 F.3d at 86. But such a generalized conflict does not debilitate the deferential standard. Cf. id. at 87. Accordingly, I conclude that we must review the employer's decision in this case for abuse of discretion because the employer contractually reserved such discretion.

The majority, while also reviewing the decision for abuse of discretion, imposes an impossibly strict fiduciary standard that cannot rationally stand. Quoting from a New York Court of Appeals decision that defines the common law standard for independent fiduciaries, the majority adopts an absolute standard, rationalizing:"Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the `disintegrating erosion' of particular exceptions." Slip op. at 14 (quoting Meinhard v. Salmon, 249 N.Y. 458, 164 N.E. 545, 546 (1928)). If that were the appropriate standard under ERISA, every employer who administers a plan for employees violates the standard before administration even begins. While Firestone instructs that we be"guided" by common law trust principles, that instruction is not the equivalent of the majority's conclusion that ERISA is a "codification of the common law of trusts." Slip op. at 13. Even the legislative history suggests that only certain principles of trust law are codified. See Firestone, 489 U.S. at 110. I believe that in this case we should determine only whether Hughes Aircraft and Hartford abused their discretion in denying Edmonds' benefits in the circumstances in this case, applying the routinely established level of review.

When we view the highly subjective evidence about Edmonds' condition under this standard and the fact that judgments on both sides are based more on what Edmonds has said than on what objective medical evidence demonstrates, we cannot say that the employer abused its discretion in interpreting the plan to deny long-term disability benefits. The reports submitted on behalf of Edmonds find at most that she is seriously depressed and cannot work. As her counselor, who is not a doctor, said, "Mrs. Edmonds remains seriously depressed and, in my opinion, is not capable of returning to office work for an extended period of time." Her psychiatrist concluded that

20

Edmonds had an anxiety disorder, "exacerbated by thoughts of work, discussion of work, or the need to attend her work environment." The employer's evidence, supplied by two outside persons, although not much more penetrating, nevertheless reaches a different conclusion. The employer's retained doctor concedes that although Edmonds suffers from "some psychiatric symptoms of dysthymia, that is: a rather low-grade depression and dissatisfaction with life, symptoms of anxiety that have persisted throughout her life, [and] a tendency to physicalize or somatize her stress," no medical or psychiatric limitations would prevent Edmonds from "functioning adequately" at work. In evaluating these conflicting reports, the majority seems to engage in factual finding, favoring reports of the employee's privately retained professionals, who are clearly advocating on her behalf, over reports of two independent firms on retainer with the employer.

The symptoms of depression exhibited by the evidence in the record merit sympathy and medical treatment. Indeed, the employer found them to merit an award of short-term disability benefits. But to conclude that the employer abused its discretion in denying Edmonds long-term benefits cannot be supported by the record when applying an abuse of discretion standard. Under that standard, we do not determine whether we agree with the result, but only whether there is a rational basis for the decision. I believe there clearly is such a basis here.

For the foregoing reasons, I respectfully dissent from the court's decision to reverse and remand.