Zeffie R. BROGAN, Plaintiff–Appellant,

v.

Michael H. HOLLAND; Paul R. Dean; Marty D. Hudson; Elliot A. Segal, as Trustees of the United Mine Workers of America Pension Plan and Trust, Defendants–Appellees.

No. 96–1022.

United States Court of Appeals, Fourth Circuit.

Argued Oct. 28, 1996.

Decided Jan. 24, 1997.

**ARGUED:** Robert B. Wilson, Charleston, West Virginia, for Appellant. Matilda Ann Brodnax, Senior Associate Counsel, Office of the General Counsel, UMWA Health and Retirement Funds, Washington, D.C., for Appellees. **ON BRIEF:** Roger D. Forman, Forman & Crane, L.C., Charleston, West Virginia, for Appellant. Glenda S. Finch, Associate General Counsel, Office of the General Counsel, UMWA Health And Retirement Funds, Washington, D.C., for Appellees.

Before MURNAGHAN, WILLIAMS, and MICHAEL, Circuit Judges.

Affirmed by published opinion. Judge WILLIAMS wrote the opinion, in which Judge MURNAGHAN and Judge MICHAEL joined.

## OPINION

WILLIAMS, Circuit Judge:

In early 1988, Zeffie Brogan applied to the United Mine Workers of America 1974 Pension Plan (the Plan) for a disability pension, claiming that he was "totally disabled as a result of a mine accident." The Trustees of the Plan denied Brogan's application. Pursuant to § 502(a)(1)(B) of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1132(a)(1)(B) (1988), Brogan sought relief in federal district court. He contended he suffered a disabling stroke while lifting heavy oxygen tanks in the mine during the early morning hours of December 18, 1986. The district court granted the Trustees' motion for summary judgment, finding that the

Trustees did not abuse their discretion in denying Brogan's application for benefits.

On appeal, Brogan claims the Trustees abused their discretion by denying him benefits. He also claims that the Trustees violated the ERISA notice requirements of 29 C.F.R. § 2560.503.1(f) (1996) by denying him the opportunity for a full and fair review of his claims on appeal. We hold that the decision of the Trustees to deny benefits to Brogan under the Plan was not an abuse of discretion considering, among other things, the conflicting medical reports presented. We also hold that the Trustees substantially complied with the applicable notice requirements. Accordingly, we affirm.

## I.

Brogan, who last worked on the nightshift of December 17–18, 1986, was employed by Westmoreland Coal Company primarily as a beltman, although he sometimes performed the duties of an electrician and welder. His duties often involved strenuous physical labor, including shoveling coal and lifting and carrying heavy objects. During the three weeks preceding December 18, 1986, Brogan worked extensive overtime. On Friday, December 12, 1986, Brogan began experiencing dizziness and had difficulty maintaining his balance. His condition worsened the following week. On the night of December 17–18,

1986, Brogan was asked to work overtime on a welding job. As part of that task he was required to carry heavy oxygen tanks, lift cables, and "jack up" the scoops he was repairing. Regarding the night of December 17, Brogan later said, "I knew something was wrong with me but I thought that I was just tired." (J.A. at 552.) Not until December 18, however, did Brogan "actually start falling down." (J.A. at 543–44.)

On December 18, 1986, Brogan completed the welding job at 3:30 a.m., drove 4–5 miles home, and went to bed around 5:00 a.m. He awoke at 10:00 a.m., ate, took his insulin,[1] and slept until noon. When he awoke, Brogan discovered his left side was partially paralyzed. He called in sick for work and stayed in bed the remainder of the day and night. The following morning, December 19, 1986, Brogan was admitted to the hospital where he was diagnosed as having suffered a stroke.

On October 26, 1987, an Administrative Law Judge awarded Brogan Social Security disability insurance benefits commencing December 17, 1986.[2] Brogan then applied for disability pension benefits under the Plan on February 17, 1988. The Trustees denied his application on March 7, 1988, finding that he did not establish that he had been "involved in a mine accident." (J.A. at 366.) In July of 1988, Brogan attended a prehearing

---

1. Brogan was diagnosed as a brittle diabetic in 1974 and suffered from numerous other ailments. He was awarded a 10% disability rating on his back and 2% on his thumb as the result of an injury suffered while carrying a heavy tank at work in 1975. In 1978 Brogan's knee was crushed at work and he received a 20% disability rating. Medical records indicated elevated blood pressure levels as early as 1979 and Brogan was subsequently placed on anti-hypertensive medication in June of 1986. He also reported suffering a back injury at work in 1979 that occasionally caused him problems. In 1981 Brogan again reported back problems and showed the early signs of diabetic retinopathy. In September of 1985 Brogan stopped working for a time due to emotional problems stemming from his son's accidental death. At this same time, Brogan began taking anti-depressants. Subsequent to a fall at home in January of 1986, Brogan began complaining of neck and shoulder pain. This condition resulted in a cervical laminectomy on April 11, 1986. Brogan was also a cigarette smoker.

2. We recognize that the Social Security ALJ's findings are generally accorded great deference when determining the onset date of a claimant's disability. See Richards v. United Mine Workers Health & Retirement Fund, 895 F.2d 133, 135 (4th Cir.1990). However, in this case, the December 17 onset date of total disability is not entitled to such weight in light of the inaccuracies in the ALJ's findings. For example, the ALJ incorrectly found Brogan had not engaged in substantial gainful activity since December 17, when Brogan admittedly continued to work into the morning hours of December 18. Furthermore, the ALJ found that prior to December 17, Brogan had the "residual functional capacity to perform the physical exertional requirements of work except for prolonged walking or standing or anything except very light sedentary activity." (J.A. at 24. (emphasis added)) Clearly, this finding is inconsistent with Brogan's actual condition since he admittedly engaged in overtime work which included strenuous shoveling and lifting the week preceding December 17.

conference in which a counselor explained why his application had been denied. Brogan subsequently withdrew his request for a hearing to appeal the Trustees' denial of benefits. In December of 1988, Brogan sought state workers' compensation benefits for his injury. His claim was denied because the ALJ found Brogan failed to establish that his stroke "occurred in the course of his employment." (J.A. at 873.) Six years later, in June of 1994, Brogan requested reconsideration of his application for disability benefits under the Plan and submitted additional medical documentation in support of his claim. The Trustees reviewed the additional evidence, including Brogan's entire state workers' compensation file which they obtained with his consent, and again denied his request for benefits. Brogan then appealed to the district court. The district court granted the Trustees' motion for summary judgment, holding the Trustees did not abuse their discretion in denying Brogan benefits. This appeal followed.

## II.

In reviewing a grant of summary judgment, we examine the district court's decision *de novo*, employing the same standards applied by the district court. *See Sheppard & Enoch Pratt Hosp., Inc. v. Travelers Ins. Co.*, 32 F.3d 120, 123 (4th Cir.1994). In *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), the Supreme Court significantly curtailed a court's ability to review a discretionary decision of the administrators of an employee benefits plan. The Court held that if "the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan," *id.* at 115, 109 S.Ct. at 956, a reviewing court may reverse the denial of benefits only upon a finding of abuse of discretion by the trustees, *see id.* at 111, 109

S.Ct. at 954; *see also Lockhart v. United Mine Workers of America 1974 Pension Trust*, 5 F.3d 74, 77 (4th Cir.1993).[3] Because the Trustees of the Plan exercise such discretion, *Lockhart*, 5 F.3d at 77, their "decisions are reviewed for abuse of discretion and will not be disturbed if they are reasonable." *Bernstein v. CapitalCare, Inc.*, 70 F.3d 783, 787 (4th Cir.1995). Under this standard, the Trustees have not abused their discretion if their decision "is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." *Id.* at 788 (internal quotations omitted).

In *Lockhart*, we discussed the criteria for determining whether the trustees of an employee benefit plan abused their discretion in denying benefits:

"[W]e must give due consideration, for example [1] to whether administrators' interpretation is consistent with the goals of the plan; [2] whether it might render some language in the plan meaningless or internally inconsistent; [3] whether the challenged interpretation is at odds with the procedural and substantive requirements of ERISA itself; [4] whether the provisions at issue have been applied consistently; [5] and of course whether the fiduciaries' interpretation is contrary to the clear language of the plan."

5 F.3d at 77 (quoting *de Nobel v. Vitro Corp.*, 885 F.2d 1180, 1188 (4th Cir.1989)). Brogan's challenge to the Trustees' decision focuses exclusively on the fifth factor, *i.e.*, whether the decision was contrary to the clear language of the Plan. Therefore, we will confine our review to determining whether the Trustees' denial of Brogan's benefits was contrary to the clear language of the Plan and its accompanying rules and regulations.

### A.

Article II.C of the Plan provides for disability pension benefits to those persons

---

3. We have yet to decide whether the "arbitrary and capricious" standard previously used by the Fourth Circuit is synonymous with the "abuse of discretion" standard adopted in *Firestone Tire & Rubber Co.*, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). Because any difference between the two standards in this case is insignificant, we need not resolve the issue. *See Sheppard & Enoch Pratt Hosp., Inc. v. Travelers Ins.*

*Co.*, 32 F.3d 120, 125 n. 4 (4th Cir.1994) ("[W]e believe the result would be the same whether the abuse of discretion standard and the arbitrary and capricious standard are the same or not; therefore, we likewise need not resolve[the] issue [of whether the arbitrary and capricious standard is still viable after *Firestone Tire & Rubber Co.*].").

who become "totally disabled as a result of a mine accident." (J.A. at 1612.) Article VIII. B(1) of the Plan grants the Trustees the authority to promulgate rules and regulations to implement the Plan. (J.A. at 1627.) The Plan also binds all persons claiming benefits under the Plan to these interpretive guidelines, known as "Q & As." We afford the Trustees' interpretation of these rules the same deference that we give the Trustees' interpretation of the language of the Plan itself. *See Lockhart,* 5 F.3d at 78 n. 6. Because there is no dispute that Brogan is totally disabled, we focus only on whether his disability was causally related to a mine accident.

Q & A 252 provides that a miner is totally disabled as a result of a mine accident if the following conditions are met:

(1) *Unexpectedness:* The disability must have been unlooked for and unforeseen; (2) *Definiteness:* The disability must be traceable to a definite time, place, and occasion which occurred within the course of the mine worker's employment. A progressive disease does not meet this test and therefore cannot be a disability that resulted from a mine accident; (3) *Force or Impact:* The disability must have been caused by the exertion or impact of some external physical force or object against the body or by the exertion or impact of the body against some external physical object; i.e., not simply as the result of the mine worker's own physical condition.

The Trustees found Brogan's disability lacked both "definiteness" and "force or impact" as required under Q & A 252 and therefore, did not occur "as a result of a mine accident."

■ There is substantial evidence to support the Trustees' conclusion that Brogan failed to demonstrate that his stroke[4] was "traceable to a definite time, place, and occasion which occurred within the course of [his] employment." Q & A 252(2). Most compelling are the various medical reports submitted and obtained through Brogan's state workers' compensation file, which present widely conflicting views as to when Brogan's stroke most likely occurred. In Brogan's final hospital discharge summary dated December 29, 1986, Dr. Sharma, an internist who examined Brogan on several occasions, wrote that the effects of Brogan's stroke "all started a couple of days before he came to the hospital." (J.A. at 606.) Moreover, in October of 1987, Dr. Sharma wrote that Brogan's injury did not arise out of his employment. In April of 1989, however, Dr. Sharma opined that Brogan's long work hours "possibly may have precipitated the stroke." (J.A. at 50.) But in September of 1989, Dr. Sharma explained "undue exertion can unmask[,] but not cause a stroke.... [A stroke] can evolve in a few hours, ... it can evolve in that short period." (J.A. at 509.) Similarly, in a July 1989 deposition, Dr. Ignatiadis, a consulting neurologist who performed Brogan's cervical laminectomy in April of 1986, testified that based on Brogan's "swaying" symptoms, the stroke occurred on December 16 while he was working, three days prior to his admission to the hospital. However, five months later, Dr. Ignatiadis changed his opinion and wrote that Brogan "had a cerebral vascular accident [stroke] in the mines on December 18, 1986." (J.A. at 45, 608.)

Brogan consulted numerous physicians from 1990 to 1993 in preparation for his state workers' compensation hearing. Dr. Heck, a neurologist, found no causal relationship between the stroke and Brogan's work. Instead, in his June 1990 deposition, he indicated that Brogan's "stroke was due entirely to his medical problems [diabetes and mild hypertension]." (J.A. at 649.) Dr. Heck admitted that the stress of long working hours could accelerate hypertension. However, he explained that the type of stroke associated with accelerated hypertension is a hemorrhagic stroke, whereas Brogan suffered from an ischemic thrombotic stroke. Furthermore, Brogan's blood pressure, as recorded at the hospital upon his admission on December 19, was not high enough to have caused this type of stroke. Dr. Chillag, a consulting

---

4. Brogan made no effort to show that any of his other ailments qualified as resulting from a mine accident. Rather, he appears to concede they were subject to the progressive disease exception of Q & A 252(2) and, therefore, do not give rise to a compensable disability under the Plan.

orthopedic surgeon, stated in a March 1991 letter that Brogan suffered his stroke on December 18, 1986, but did not clarify whether the stroke occurred at work or after returning home. However, in an April 1991 letter, Dr. Chattin, an osteopathic physician, definitively stated that Brogan suffered a cerebrovascular accident while at work on December 18, 1986. He agreed with Dr. Heck that Brogan suffered an ischemic, rather than hemorrhagic, stroke but claimed that Brogan's lifting and carrying of heavy objects at work increased his blood pressure and caused the stroke. However, on cross-examination, Dr. Chattin admitted Brogan's pre-existing diabetic condition caused his blood pressure to rise during normal exercise. Dr. Poffenbarger, a neurologist, testified in a March 1992 deposition that, based on his evaluation of Brogan and the circumstances surrounding his stroke, Brogan suffered a stroke in his sleep while at home on December 18. He attributed Brogan's dizziness at work to hypertension, rather than the stroke. Dr. Poffenbarger admitted that although heavy lifting can be an aggravating factor of a stroke, Brogan's stroke was caused by a combination of diabetes, hypertension, smoking, and stress. In sum, while some of the consulting physicians stated overexertion could contribute to a rise in blood pressure precipitating a stroke, no medical report specifically stated Brogan suffered his stroke while lifting heavy oxygen tanks in the mine during the early morning hours of December 18, 1986.

■ Notably, Brogan failed to offer any eyewitness accounts of the events of December 17–18, 1986, and none of the submitted medical reports are contemporaneous with Brogan's December 19 hospital admission.[5] Brogan also failed timely to report the stroke as an accident to his employer and he waited nearly two years after his stroke before he filed a state workers' compensation claim.

Furthermore, although not determinative, the state workers' compensation ALJ's finding that Brogan did not suffer a "definite, isolated, fortuitous event" (J.A. at 873) supports the Trustees' decision.[6]

Brogan argues that the Trustees abused their discretion when they disregarded testimony he gave at his state workers' compensation hearing without making an explicit finding that such testimony lacked credibility. According to Brogan, the testimony established when and how his stroke occurred. However, an examination of Brogan's testimony reveals that he never definitively stated when he thought the stroke occurred. On the contrary, when asked on what day he had the stroke, Brogan replied:

> Well [I] actually started falling down on Thursday morning on the 18th[,] but I had been dizzy and having some balance problems there—really when I started doubling [on December 12 or 13]. I didn't know what was wrong with me but I know I was dizzy and I was having some balance problems.

(J.A. at 543.) Brogan began "doubling," or working double shifts, on December 12 or 13. Thus, he began experiencing dizziness as early as December 12, but continued working until the day before he was hospitalized on December 19. That Brogan was able to continue working, drive a car home from work in the early morning hours of December 18, awake and eat breakfast, all prior to awakening in the afternoon partially paralyzed, is consistent with a finding that the stroke did not occur until he returned home from work on December 18. Thus, the evidence presented is conflicting as to when Brogan suffered his stroke. Accordingly, it was not unreasonable for the Trustees to conclude Brogan's stroke was not "traceable to a definite time, place and occasion." Q & A 252(2).

---

5. Brogan's hospital discharge summary, dated closest in time to the stroke, states his stroke occurred a few days prior to his admission to the hospital, not on December 18 as Brogan argues.

6. Brogan contends that the Trustees' and the district court's reliance upon the state workers' compensation finding was erroneous as a matter of law. This argument is without merit. The

district court expressly stated the workers' compensation finding was not determinative, but merely additional evidence to support the Trustees' decision. A state workers' compensation ALJ's findings may be considered evidence when awarding pension benefits. *See Richards v. UMWA Health and Retirement Fund,* 895 F.2d 133, 134, 138 (4th Cir.1990).

## B.

■ Q & A 252(3) also requires Brogan to show that his stroke was caused by the impact of some external force or object against his body, not simply as the result of his own physical condition. Brogan contends his stroke was the result of lifting heavy oxygen tanks. However, for the reasons cited above,[7] we disagree and hold that the Trustees did not abuse their discretion in refusing to find Brogan's stroke was caused by an external force or object.

## III.

■ Nevertheless, Brogan contends that the Trustees' decision was contrary to the plain language of subsection (k) of Q & A 252, a listed example of a mine accident, and this court's decision in *Richards v. UMWA Health and Retirement Fund*, 895 F.2d 133 (4th Cir.1990), a case involving a miner suffering from progressive heart disease who had a heart attack at work. We disagree. Q & A 252 lists several examples of "mine accidents" qualifying the miner for benefits. Among the examples is the following: "[A] miner suffers a heart attack while pushing a heavy object in the normal course of his job." Q & A 252(k). In *Richards*, this court held that:

> A reading of the Trustees' regulations [Q & A 252] establishes that, once [a claimant] shows that he suffered a heart attack while lifting heavy objects in the mine, he qualifies for benefits if the heart attack in turn caused his disability. Q & A 252(k) precludes further inquiry into whether the heavy lifting was merely coincidental to or instead actually caused the heart attack. All that matters is that the heart attack occurred during heavy lifting at work.

895 F.2d at 137. The Trustees' decision in this case is not contrary to *Richards* because even if the Trustees were to construe subsection (k) as applicable to strokes, unlike the claimant in *Richards*, Brogan failed to produce any medical evidence to directly support his position that his stroke occurred while he was lifting oxygen tanks during the

December 17–18 shift. In fact, Brogan's testimony at the workers' compensation hearing demonstrates his own uncertainty as to the timing of his stroke. *See supra* at p. 163.

In *Richards*, this court emphasized that subsection (k) was an exception to the progressive diseases rule disqualifying a claimant for mine benefits. *See Richards*, 895 F.2d at 137 ("[T]he 'progressive diseases' proviso should be read ... as an instruction on how to handle situations that do not fall into any of the enumerated examples of 'mine accidents' in Q & A 252.").

Furthermore, Brogan has not cited any decision of the Trustees applying the subsection (k) exception to a stroke. As a result, we cannot say the Trustees abused their discretion by denying Brogan benefits when medical evidence presented linked Brogan's stroke to his preexisting diabetes and hypertension.

■■ The Plan was the result of comprehensive collective bargaining. The Trustees are obligated "to guard the assets of the trust from improper claims, as well as ... to pay legitimate claims." *LeFebre v. Westinghouse Elec. Corp.*, 747 F.2d 197, 207 (4th Cir.1984). We will defer to the Trustees' interpretation of the Q & As as long as it is not contrary to the plain language of the Plan. *See Lockhart*, 5 F.3d at 78 n. 6. We have noted "where plan fiduciaries have offered a reasonable interpretation of disputed provisions, courts may not replace it with an interpretation of their own." *Id.* at 77 (citing *de Nobel v. Vitro Corp.*, 885 F.2d 1180, 1188 (4th Cir.1989)). Our narrow standard of review "exists to ensure that administrative responsibility rests with those whose experience is daily and continual, not with judges whose exposure is episodic and occasional." *Berry v. Ciba–Geigy Corp.*, 761 F.2d 1003, 1006 (4th Cir.1985). Because the Trustees' interpretation of Q & A 252 is not unreasonable, we defer to the Trustees' decision.

## IV.

■ Finally, Brogan contends the Trustees violated ERISA regulations when they

---

7. We particularly note the opinions of Dr. Heck and Dr. Poffenbarger regarding the cause of Brogan's stroke.

failed to notify him of the specific reason for the denial of benefits, the pertinent Plan provisions, and the types of information needed to establish eligibility. As a result, Brogan contends, the Trustees denied him the opportunity for a full and fair review of his claims on appeal. Whether the Trustees' March 7, 1988 denial notice was consistent with ERISA regulations is a question of law, and therefore, subject to *de novo* review. *See Gauer v. Connors*, 953 F.2d 97, 99–100 (4th Cir.1991) (holding that the applicability of ERISA and its regulations to the UMWA 1950 Pension Plan is a question of law)(citing *Weil v. Retirement Plan Admin. Comm.*, 913 F.2d 1045, 1049 (2d Cir.1990), *vacated on other grounds*, 933 F.2d 106 (2d. Cir.1991)). Not all procedural defects will invalidate a plan administrator's decision if there is "substantial compliance" with the regulation. *See Sheppard & Enoch Pratt Hosp., Inc.*, 32 F.3d 120, 127 (4th Cir.1994). To substantially comply with the regulation, the Trustees must have supplied the beneficiary "with a statement of reasons that, under the circumstances of the case, permitted a sufficiently clear understanding of the administrator's position to permit effective review." *Donato v. Metropolitan Life Ins. Co.*, 19 F.3d 375, 382 (7th Cir.1994) (internal quotations omitted); *see also Dzinglski v. Weirton Steel Corp.*, 875 F.2d 1075, 1078 (4th Cir.), *cert. denied*, 493 U.S. 919, 110 S.Ct. 281, 107 L.Ed.2d 261 (1989) (holding that "the sufficiency of the explanation is not to be judged in a vacuum but under the terms of the plan").

ERISA requires the Trustees to give Brogan the "specific reasons" for the denial of benefits and to afford him a reasonable opportunity for a "full and fair review" of the denial decision. *See* 29 U.S.C.A. § 1133 (West 1985).[8] The corresponding regulation sets forth specifically what the denial notice must contain:

> (f) *Contents of notice.* A plan administrator or, if paragraph (c) of this section is applicable, the insurance company, insurance service, or other similar organization, shall provide to every claimant who is denied a claim for benefits written notice setting forth in a manner calculated to be understood by the claimant:
>
> (1) The specific reason or reasons for the denial;
>
> (2) Specific reference to pertinent plan provisions on which the denial is based;
>
> (3) A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary; and
>
> (4) Appropriate information as to the steps to be taken if the participant or beneficiary wishes to submit his or her claim for review.

29 C.F.R. § 2560.503–1 (1996). A review of the March 7, 1988, denial letter reveals that the Trustees complied with subsections (1) and (4) of the regulation. The Trustees concede, however, that the denial letter failed to comply with subsections (2) and (3).[9]

Subsequent to the Trustees' initial denial of Brogan's benefits, Brogan attended a prehearing conference on July 18, 1988, in which a counselor explained why his application had been denied. According to the conference

---

**8.** 29 U.S.C.A. § 1133 states:

> In accordance with regulations of the Secretary, every employee benefit plan shall
> (1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and
> (2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

**9.** The letter stated, in pertinent part:

> We regret to inform you that your application for a disability pension has been denied because you do not meet the eligibility requirements of the 1974 Pension Plan.
> Your application was denied because:
> You have not established that you were involved in a *mine accident* after December 6, 1974.
> Please contact our office if you disagree with our decision. We will be glad to discuss the eligibility requirements for disability pensions. If you are not satisfied that our decision is correct, you can request a hearing. This request must be filed within 90 days of the date of this letter.
> (J.A. at 366.)

summary, the counselor gave Brogan a copy of the pertinent Plan provisions on which his claim was denied, including definitions of "disability pension" and "accident," and explained to Brogan that he was required to prove his stroke occurred during the course of his employment. The counselor also informed Brogan that he needed to submit additional documentary evidence of a mine accident, and that the stroke may be compensable if his attending physicians believed the stroke was "caused by stress while working." (J.A. at 16.)

Brogan denies he was given a sufficient explanation for the Trustees' denial of benefits upon which he could base his appeal. Based on Brogan's subsequent actions, however, we conclude that Brogan was given the necessary information. Prior to the prehearing conference Brogan merely alleged that his stroke occurred in the mines. Subsequent to the meeting, Brogan applied for state workers' compensation benefits and filed an accident report in an attempt to document the occurrence of a mine accident. In addition, Brogan acquired various medical reports in support of his position that his stroke occurred while working in the mines. We agree with the Trustees that these actions indicate that Brogan understood the issues confronting him. Therefore, we hold that the March 7, 1988, letter, read in conjunction with the information Brogan acknowledged he received during the prehearing conference, substantially complies with the regulation's requirements.

### V.

In conclusion, we hold that the Trustees' decision to deny Brogan disability benefits under the UMWA 1974 Pension Plan was based on a reasonable interpretation of the Plan and its accompanying rules and regulations. Furthermore, the Trustees substantially complied with the applicable ERISA notice requirements, affording Brogan the opportunity for a full and fair review. Accordingly, we affirm.

*AFFIRMED.*