Melody V. PORTER, Plaintiff,

v.

METROPOLITAN LIFE INSURANCE CO., Defendant.

No. 7:98–166–20.

United States District Court,
D. South Carolina,
Spartansburg Division.

Sept. 16, 1998.

Robert Hoskins, Greenville, SC, for Plaintiff.

H. Sam Mabry, III, James D. Quattlebaum, Greenville, SC, for Defendant.

## ORDER

HERLONG, District Judge.

This matter is before the court on the parties' cross-motions for summary judgment. Melody V. Porter ("Porter") challenges the defendant's denial of her claim for long term disability ("LTD") benefits under the Ingersoll–Rand Company Long Term Disability Plan ("Plan"). The defendant, Metropolitan Life Insurance Company ("MetLife"), insures and administers the Plan.

This case is governed by the Employee Retirement Income Security Act of 1976 ("ERISA"). See 29 U.S.C. § 1001 et seq. As ERISA cases are decided on the administrative record, the parties have agreed to allow the court to decide the case on the merits as opposed to the more exacting summary judgment standard. For the reasons stated below, the court finds that MetLife did not abuse its discretion in denying Porter's claim for LTD benefits.

### I. Facts

Prior to her injury, Porter was employed by Ingersoll–Rand as a computer technician. In 1995, Porter injured her left knee, which eventually required several arthroscopic surgeries, including surgery to remove the patella. In March of 1996, Porter attempted to return to work; however, she states that her injury prevented her from working at her job on a permanent basis.

In March of 1997, Porter submitted a claim for LTD benefits. (Def.'s Mem.Supp.Mot. Summ.J. at Ex. 3 [hereinafter referred to by Exhibit number only].) Porter alleged that she had been disabled since December 18, 1996, and stated: "Due to my injuries, I'm not able to sit for long periods of time. Also have very little strength in knee. It will give away without warning. Must use wheelchair if I plan to do extensive walking." (Id.) Porter stated that her last day of work was June 8, 1996.

In reviewing Porter's claim, MetLife obtained a description of Porter's job, stating that Porter's normal duties included: 1) entering data into a computer—4 hours; 2) taking work order requests by phone—1.5 hours; 3) writing work orders and typing in data—1.5 hours; and 4) running reports on a computer—1 hour. (Def.'s Ex. 5.) It indicated that these duties required sitting for six hours, standing for one hour, and walking for one hour. Additionally, the job description stated that Porter was required to lift and carry up to ten pounds "occasionally." (Id.)

In reviewing the claim, MetLife required Porter's doctor, Dr. W. Ray Henderson ("Henderson"), to complete a physical capacities evaluation ("PCE") of Porter. The PCE stated that Porter was capable of sitting for six hours, standing for one hour, and walking for one hour. (Def.'s Ex. 6.) The PCE also stated that Porter was capable of lifting and carrying up to ten pounds "occasionally" and that she was capable of bending "frequently" during an eight hour day. (Id.) In addition to the PCE, MetLife reviewed Dr. Henderson's medical records, which indicated that Porter suffered from a thirty-five percent (35%) knee impairment. (Def.'s Ex. 7.) These records also revealed that Porter told Dr. Henderson that she could not return to her prior work and that Dr. Henderson recommended that she find other employment.

After reviewing the above information, MetLife denied Porter's LTD claim on September 4, 1997. (Def.'s Ex. 8.) In its denial letter, MetLife quoted language from the official Plan document and stated that this language required Porter to be disabled from any gainful employment in order to be eligible for LTD benefits. However, in rejecting her claim, MetLife stated that the evidence before it indicated that Porter could perform her own occupation as a computer technician.

After this denial, Porter hired an attorney for her appeal. Porter's counsel submitted the following documents to MetLife: 1) an affidavit of Porter; 2) an affidavit of Dr. Henderson along with medical records; and 3) medical records of Dr. Jeffrey G. Mokris ("Mokris"). (Def.'s Ex. 11.) Subsequently, MetLife wrote plaintiff's counsel, indicating that Dr. Henderson's affidavit referenced an unrelated case. (Def.'s Ex. 13.) Plaintiff's

counsel then submitted a revised affidavit of Dr. Henderson. (Def.'s Ex. 14.)

On January 10, 1998, MetLife denied Porter's appeal. (Def.'s Ex. 15.) As before, it applied the definition of "disability" as found in the official Plan document. In its denial letter, MetLife stated that it disregarded Dr. Henderson's amended affidavit because it was simply a photocopy of the original affidavit with the unrelated patient's name replaced by Porter's. MetLife noted that the signatures on the amended affidavit and the notarization appeared to be photocopies of the signature and notarization on the first affidavit. Additionally, MetLife stated that Dr. Mokris's records reflected that Porter only saw this doctor on one occasion in July of 1997 and that these records did not support her claim. Finally, MetLife rejected Porter's assertion that the definition of "total disability" should come from a summary of the official Plan document ("summary plan description," or "SPD"), which had been provided to Porter by her employer. Nevertheless, MetLife stated that even if it were to apply the "own occupation" standard of the SPD (as opposed to the "any occupation" standard of the official Plan document), it still would deny LTD benefits to Porter because she was capable of performing the functions required of her own occupation.

## II. DISCUSSION

### A. Standard of Review

In this ERISA case, the standard of review of the administrator's decision is "modified" abuse of discretion. Normally, "[i]n cases where the benefit plan grants the administrator or fiduciary discretionary authority to determine eligibility or to construe the terms of the plan, the denial decision must be reviewed for abuse of discretion." *Ellis v. Metropolitan Life Ins. Co.*, 126 F.3d 228, 232 (4th Cir.1997) (citing, e.g., *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 111, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989)). This standard is deferential, and "the administrator['s] ... decision will not be disturbed if it is reasonable." *Id.* (citing, e.g., *Bruch*, 489 U.S. at 115, 109 S.Ct. 948). "Such a decision is reasonable if it is 'the result of a deliberate, principled reasoning process and it is supported by substantial

evidence.'" *Id.* (quoting *Brogan v. Holland*, 105 F.3d 158, 161 (4th Cir.1997) (citation omitted)).

However, "[t]he Supreme Court has recognized that where a plan administrator or fiduciary is vested with discretionary authority and is 'operating under a conflict of interest, that conflict must be weighed as a factor[ ] in determining whether there is an abuse of discretion.'" *Id.* at 233 (second alteration in original) (citations omitted). Consequently, the abuse of discretion standard remains, but "the court applies the conflict of interest factor, on a case by case basis, to lessen the deference normally given under this standard of review only to the extent necessary to counteract any influence unduly resulting from the conflict." *Id.* In short, the court

modifies th[e] abuse of discretion standard according to a sliding scale. The more incentive for the administrator or fiduciary to benefit itself by a certain interpretation of benefit eligibility or other plan terms, the more objectively reasonable the administrator or fiduciary's decision must be and the more substantial the evidence must be to support it.

*Id.*

In the instant case, there is no dispute that MetLife has discretionary authority over the Plan. Both the official Plan document, (Def.'s Ex. 2 at 27), and the SPD, (Pl.'s Mem.Supp. Mot.Summ.J. at Ex. A, at 9 [hereinafter referred to by Exhibit letter only] ), explicitly reserve discretion to the Plan Administrator to construe terms and determine eligibility. As a result, the abuse of discretion standard is applicable.

In addition, there is a conflict of interest in MetLife being both the insurer and administrator of the plan. The United States Court of Appeals for the Fourth Circuit has made clear that a conflict exists when the insurer of a plan also exercises discretionary control over the administration of the plan:

In this case, Blue Cross insured the plan in exchange for the payment of a fixed premium, presumably based on actuarial data. Undoubtedly, its profit from the

insurance contract depends on whether the claims allowed exceed the assumed risks. To the extent that Blue Cross has discretion to avoid paying claims, it thereby promotes the potential for its own profit. That type of conflict [of interest] flows inherently from the nature of the relationship entered into by the parties and is common where employers contract with insurance companies to provide and administer health care benefits to employees through group insurance contracts.

*Doe v. Group Hospitalization & Med. Servs.,* 3 F.3d 80, 86 (1993). The Fourth Circuit implied that a "mechanism to collect from the employer retrospectively for unexpected liabilities" could remove the conflict. *Id.* In the instant case, however, the insurance policy between MetLife and Ingersoll–Rand makes no mention of any such mechanism, (Def.'s Ex. 1), and no other evidence has been presented to show such a mechanism.

Although MetLife claims that there is no conflict of interest, it simply relies on an unsupported statement that "[a] mere allegation of a conflict [by a plaintiff] is 'insufficient.' " (Def.'s Reply to Ct.'s June 4, 1998, Order at 1.) MetLife contends that in addition to the allegation, a plaintiff must "prov[e] that the conflict existed and that such conflict altered the claim decision." (*Id.*) MetLife has offered no case law in support of its contention, and the court is not aware of any such case law. In light of the clear conflict of interest, the court rejects MetLife's argument. As a result, the court will apply the less deferential "modified" abuse of discretion standard.

### B. Applicable Definition of Total Disability

█ The parties each assert a competing definition of "total disability." Porter claims that the definition included in the SPD controls. MetLife applied the definition found in the official Plan document. These two definitions are very different. The definition in the SPD employs an "own occupation" standard: Porter is disabled if she is "wholly and continuously unable to perform the duties pertaining to [her] *own* occupation." (Pl.'s Ex. A at 5 (emphasis added).) The definition further clarifies that over the first

two and one-half years, the employee must be unable to "perform each and every duty pertaining to *your* occupation" and that "thereafter, you cannot perform the duties of *any* occupation." (*Id.* (emphasis added).) The official Plan document, however, defines it as being "unable to perform each of the material duties of *any* gainful work or service for which you are reasonably qualified taking into consideration your training, education and experience." (Def.'s Ex. 2 at 8 (emphasis added).) Porter readily concedes that "if the court determines that the Defendant's definition of 'disability' is applicable to the Plaintiff's claim, the Defendant should prevail." (Pl.'s Reply to Ct.'s June 4, 1998, Order at 6.)

The Fourth Circuit has held that " 'if there [is] a conflict between the complexities of the plan's language and the simple language of the [summary plan description], the latter . . . control[s]' " "if the participant relied on the summary plan description or was prejudiced by it." *Hendricks v. Central Reserve Life Ins. Co.,* 39 F.3d 507, 511 (4th Cir.1994) (second alteration in original) (citations omitted). The test is a disjunctive one: there must be either "significant reliance" *or* "possible prejudice" on the part of Porter. *Aiken v. Policy Management Sys. Corp.,* 13 F.3d 138, 141 (4th Cir.1993).

█ Porter has not shown the type of reliance required by *Aiken.* In *Aiken,* the SPD recited that retirement benefits could be obtained upon retirement after twenty years of service. *See id.* at 140. The official Plan document, however, had the additional requirement of restricting distribution until Aiken turned sixty. *See id.* Aiken claimed that, in retiring prior to age sixty, he relied on the SPD and should receive benefits immediately, in contravention of the official Plan document. *See id.* The court held that summary judgment against Aiken was inappropriate because it could not say "that Aiken did not actually rely on . . . [the SPD, or] that the issue of reliance could not reasonably be resolved in his favor." *Id.* at 141–142.

In *Aiken,* the plaintiff had a legitimate claim that he would not have resigned before

age sixty but for his reliance on the SPD. Porter's case, however, is more analogous to that of *Adams v. J.C. Penney Co.,* 865 F.Supp. 1454 (D.Or.1994), *aff'd on other grounds,* 83 F.3d 426 (9th Cir.1996), which distinguishes *Aiken.* In *Adams,* an employee claimed that she made expenditures in reliance upon the SPD, which purported to provide coverage for "hearing loss," as opposed to the official plan, which provided coverage for "total and irrevocable hearing loss." *See id.* at 1457. The court determined that reliance[1] involved a showing "that plaintiff took or failed to take any action causing her benefit to be forfeited." *Id.* at 1461. As for the plaintiff, "[t]he policy only provided coverage for total and irrecoverable hearing loss. Plaintiff could have taken no action to obtain or forfeit that benefit; either she was or was not eligible for coverage under the policy depending on the extent of her hearing loss." *Id.* The court distinguished *Aiken* in that the plaintiff

> did not take any action, prior to her filing for benefits, which detrimentally affected her ability to recover such benefits. She alleges reliance *only after she filed for benefits, not before she filed ....* Her action all occurred after her accident and after she was informed that she may not qualify for coverage.

*Id.* at 1462.

Porter's case is indistinguishable from the *Adams* case. Porter asserts that she relied on the SPD because (1) she never received a copy of the official Plan document and (2) the affidavits presented by her on appeal were "geared towards addressing the 'own occupation' standard." (Pl.'s Reply to Ct.'s June 4, 1998, Order at 5–6.) Plaintiff's argument is without merit. Like Adams, she had no control over whether she was eligible for LTD benefits under the official Plan document— either she met the "any occupation" standard or she did not. Thus, she could neither take nor fail to take action which would result in forfeiting her benefits.

The only reliance by Porter occurred *after* MetLife denied her benefits. MetLife, however, included in its denial letter the definition of "disabled," which it introduced with the statement: "Your plan states...." (Def.'s Ex. 8.) Thus, when Porter procured the affidavits, she was well aware that MetLife was using a different definition. Her situation is similar to that of Adams:

> This court finds plaintiff's reliance entirely unreasonable and without basis. Plaintiff may have reasonably assumed that her loss appeared to be covered when she initially read the SPD in July 1993. At no time, though, did defendants give any indication to plaintiff that her loss was covered. Once plaintiff made inquiries, she was informed that she was not covered under the SPD. Plaintiff cannot assert that defendants misled her after July 1993.
>
> ... The evidence is undisputed that as far back as July 1993, plaintiff was put on notice of a genuine dispute regarding coverage of her hearing loss. Plaintiff testified that she learned in late July 1993 from Mr. Bell that "there was some policy language that was against" her. Thus, plaintiff's own evidence shows that she had knowledge that the policy did not provide coverage well before any reliance by her.
>
> ... [P]laintiff does not testify that she made any attempt to obtain a copy of the policy referred to by Mr. Bell or that her request was refused. This court is not persuaded that defendants withheld the Policy information until November 10, 1993. Plaintiff had ample notice that she may not be covered prior to that time.

*Adams,* 865 F.Supp. at 1463 (emphasis omitted) (citations omitted). Porter is in the same situation as Adams. She received notice of policy language against her, yet in her appeal did not even attempt to address the definition of disability upon which MetLife based its decision. Rather, Porter continued to rely on the SPD's definition. To countenance her argument would "vitiate the very requirement of reliance.... *Otherwise, no provider would be safe from a post-denial*

---

1. Although the *Adams* court was determining whether there was "reasonable" or "detrimental" reliance, *see Adams,* 865 F.Supp. at 1460, its analysis is applicable to the "significant reli-

ance" required by the Fourth Circuit. *Cf. Gable v. Sweetheart Cup Co.,* 35 F.3d 851, 859 (4th Cir.1994) (using the terms "significant reliance" and "detrimental reliance" interchangeably).

*self-serving policy interpretation by an insured." Id.* (emphasis added).

■ Porter also claims that she would be prejudiced by the adoption of the definition in the official Plan document because (1) it is too late to change her documents in order to address the "any occupation" standard, and (2) adopting the "any occupation" standard "would 'shut her out' from receiving any benefits." (Pl.'s Reply to Ct.'s June 4, 1998, Order at 7.) These arguments have no merit. As for the first point, it has already been stated that Porter had ample opportunity to address the "any occupation" standard. *Cf. McKenzie v. General Tel. Co.*, 41 F.3d 1310, 1315–16 (9th Cir.1994) (finding that there was no prejudice to an ERISA plan recipient who never received an SPD but who had notice of its terms). As for the second point, Porter has offered no case law in support of her assertion that she would suffer prejudice when the adoption of an unfavorable definition would "shut her out" of benefits. If this is what prejudice requires, then all denials of benefits would result in prejudice. Thus, there is no prejudice to Porter.

### C. MetLife's Interpretation of the SPD's Definition of Total Disability

■ Even were the SPD definition to apply, MetLife did not abuse its discretion in determining that Porter was capable of performing her own occupation. Its decision was reasonable and supported by substantial evidence—the correlation between the PCE and the job description. This evidence clearly and objectively demonstrated that Porter could meet the physical requirements of her job as a computer technician. It also is substantial enough to overcome any incentive for MetLife to deny the claim due to its conflict of interest.

Even had MetLife considered Dr. Henderson's affidavit, it still could reasonably have denied benefits based on the aforementioned correlation between the PCE and the job description and on its interpretation of "totally disabled" in the SPD. Dr. Henderson, in his affidavit, claimed that Porter was totally disabled because "[a]lthough, certainly, Ms. Porter can perform some of the required duties of her job on an

isolated basis she unquestionably cannot continuously and on a full time basis do all of the duties required." (Def.'s Ex. 14.) The doctor's conclusion was geared toward Porter's interpretation of "total disability" in the SPD, but MetLife asserts a different interpretation.

The SPD provides:

You will be considered "totally disabled" if, due to sickness or accidental injury, you are *wholly and continuously unable to perform the duties pertaining to your own occupation.*

● for the first 2½ years of any one period of disability (26 week elimination period plus two years of benefits), *you cannot perform each and every duty pertaining to your occupation;*

● thereafter, you cannot perform the duties of any occupation (or any work for compensation or profit) for which you are reasonably fitted by education, training, or experience.

(Pl.'s Ex. A (emphasis added).) Porter argues that this definition means that MetLife, in order to deny LTD benefits, must show that "the Plaintiff can continuously and on a full-time basis perform her job." (Pl.'s Mem. Supp.Mot.Summ.J. at 12.) MetLife states that Porter's interpretation is backwards; it asserts that it need only demonstrate that she is not wholly and continuously *unable* do her job (i.e. that there is some part of her job that she can do). (Def.'s Mem.Supp.Mot. Summ.J. at 25–26.) Clearly, it would be easier for MetLife to show the latter. MetLife's interpretation of this provision is not only reasonable, but follows the plain language of the definition. Furthermore, it is in line with the part of the definition that clarifies disabled as meaning "you cannot perform each and every duty pertaining to your occupation." Under this interpretation, Dr. Henderson's affidavit actually supports there not being a total disability because he states that "Ms. Porter can perform some of the required duties of her job on an isolated basis." Thus, MetLife's decision, even if the SPD definition were to apply and even if it had considered Dr. Henderson's affidavit as part of the record, would not have been an

abuse of discretion (even under the modified standard) because it was sufficiently reasonable and supported by substantial evidence.

### D. Conclusion

In sum, because there is no reliance or prejudice, the definition of disabled in the official Plan document controls over the definition in the SPD. MetLife did not abuse its discretion in applying this definition and in denying LTD benefits to Porter, even considering the fact that deference to MetLife's decision is lessened by its conflict of interest. Furthermore, Porter has conceded that under the official Plan document's definition, she should not prevail. Finally, even were the SPD's definition to apply, MetLife did not abuse its discretion in determining that Porter was capable of performing her own occupation.

Accordingly, it is

**ORDERED** that judgment be granted to MetLife.

**IT IS SO ORDERED.**