**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

JAMES C. RAINES,
Plaintiff-Appellant,

v.

No. 97-2431

OWENS-BROCKWAY GLASS
CONTAINERS, INCORPORATED,
Defendant-Appellee.

Appeal from the United States District Court
for the Southern District of West Virginia, at Huntington.
Joseph Robert Goodwin, District Judge.
(CA-94-1039-3)

Argued: September 22, 1998

Decided: December 29, 1998

Before NIEMEYER, HAMILTON, and LUTTIG, Circuit Judges.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** James William St Clair, ST CLAIR & LEVINE, Hunting-
ton, West Virginia, for Appellant. Robert Kemp Morton, III, HUD-
DLESTON, BOLEN, BEATTY, PORTER & COPEN, Huntington,
West Virginia, for Appellee. **ON BRIEF:** Daniel J. Konrad, HUD-
DLESTON, BOLEN, BEATTY, PORTER & COPEN, Huntington,
West Virginia, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

James C. Raines (Raines), a former employee of Owens-Brockway Glass Containers, Inc. (Owens), brought this action against Owens pursuant to § 502(a)(1)(B) of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1132(a)(1)(B), seeking to recover (1) early retirement benefits under the Sixth Amended and Restated Owens-Illinois Salary Retirement Plan (the Retirement Plan) and (2) severance pay benefits under a document entitled "Termination Benefits For Salaried Employees due to the closing of the Huntington, West Virginia Owens-Brockway Glass Container Plant" (the Termination Document). (J.A. 37). The district court subsequently granted summary judgment in favor of Owens, and we now affirm.

I.

Owens owns and operates several glass manufacturing facilities in the United States. Until December 31, 1993, one of these manufacturing facilities was located in Huntington, West Virginia. Raines began his employment with Owens in May of 1961 at its facility in Huntington and continued his employment at the Huntington facility for thirty-two and one-half years until March of 1994. Raines began his career with Owens as a controller in charge of the accounting department at the Huntington facility. For the last year of his career with Owens, however, Raines worked as an administrative manager in charge of the accounting, purchasing and service departments at the Huntington facility.

On September 28, 1993, Owens announced its decision to close its facility in Huntington. The facility was scheduled to and did officially close on December 31, 1993, although Owens asked a few employees to remain at their jobs past that date to clear the inventory and transfer the fixed assets of the Huntington facility to other facilities owned by

2

Owens. Raines was one of the employees asked to stay on after the plant closed.

As part of the closure process, Owens distributed to its Huntington employees the Termination Document, which outlined the benefits to which the employees were entitled upon their departure from the company, including early retirement benefits as provided by the terms of the Retirement Plan and severance pay. The Termination Document consisted of a number of commonly asked questions with answers. Question and Answer four addressed the issue of severance pay:

> What if I am offered a transfer to another Company facility, but I refuse?
>
> Normally, if you are offered another job of an equal or higher evaluation level but refuse, no severance payment is permitted. However, since this is a plant closing, you will be eligible for severance pay regardless of your decision.

(J.A. 39). Under the Retirement Plan, early retirement benefits were available

> to any Participant with ten or more years of Credited Service whose employment with an Employer is terminated as a result of a change in the organization or operation of the Employer or as a result of a Reduction in Force and whose combined age and Years of Credited Service equals the number 65 or greater.

(J.A. 53-54). Early retirement benefits were not available if an employee voluntarily resigned from Owens. The parties agree that the Retirement Plan vested the Benefits Committee with discretion to determine an employee's eligibility for early retirement benefits.

While Owens terminated many of its Huntington employees, it offered to transfer Raines to a similar position, which he accepted, at its manufacturing facility in Zanesville, Ohio. Accordingly, on October 17, 1993, Owens posted a notice at the Zanesville facility that

3

read "Jim Raines will be transferring from Huntington and will assume the Plant Controller Position. Jim will be traveling between Zanesville and Huntington for a period of time." (J.A. 42). The transfer became effective on November 1, 1993.

From October 1993 until March 1994, Raines split his time between the Huntington and Zanesville facilities, working a few days each week at the Huntington facility transferring inventory and fixed assets to other manufacturing facilities owned by Owens and working the remainder of the week at the Zanesville facility receiving training from the out-going controller. In Zanesville, Raines occupied the out-going controller's office. During this same time, Raines applied to receive a relocation allowance from Owens, which Owens granted. Accordingly, Owens paid Raines' moving expenses and advanced him the equity in his Huntington home subject to repayment upon his selling the home, in order that he could promptly purchase a home near the Zanesville facility. Raines did promptly purchase a home near the Zanesville facility.

On March 1, 1994, Owens transferred Raines from the Huntington payroll to the Zanesville payroll. Raines remained on the Zanesville payroll for two pay periods. On Tuesday, March 15, 1994, Raines informed the Zanesville plant manager, Jim Kunkle, that he "was not going to move to Zanesville." (J.A. 115). This conversation was memorialized in a letter sent by Kunkle to Raines on March 18, 1994. Owens treated Raines' statement as his resignation from the company. Raines never returned to either the Huntington or Zanesville facility.

On April 7, 1994, Raines wrote Owens requesting the paperwork necessary to apply for early retirement. Additionally, he stated his belief that he "was still on the Huntington plant's payroll when [he] decided not to go to Zanesville." (J.A. 56). Further, he stated that he "was suppose [sic] to be on Huntington's payroll until [he] cleared the inventories and transferred all fixed assets." Id. Later in the same letter, Raines stated that "[a]ny monies [he] received for relocating to Zanesville is [sic] being repaid [and he] would like to be given the same options that the rest of the salary employees received when the plant closed." Id.

On April 15, 1994, Owens denied Raines' request for early retirement benefits under the Retirement Plan on the ground that Raines'

4

acceptance of the transfer to Zanesville and subsequent resignation from that position made him ineligible for such benefits. Specifically, Owens informed Raines by letter,

> Since you are under 55 years of age, the only way in which you would be able to retire under the plan would be as a result of a reduction in force where you had not been offered or accepted an assignment elsewhere. In checking our records, I understand that you had accepted assignments in Zanesville and, in fact, had transferred to the Zanesville salary payroll on March 1, 1994. Your subsequent resignation would make you ineligible for any benefit that you might have received as a result of the Huntington plant closing.

(J.A. 57).

Raines appealed to Owens' Benefits Committee, arguing by letter dated May 6, 1994,

> I did not resign and was not an employee of the Zanesville plant. If I had resigned, I would have written a letter saying so. . . . I was told that I had been put on the Zanesville plant as of March 1, 1994. Why was this done? I was told that I was to be on Huntington's payroll until all accounting, inventories and fixed assets were closed out. I was still working several days in Huntington each week doing this.

> \* \* \* \*

> I did accept the transfer to Zanesville but after working there I found out I had made a mistake. . . . I could not withstand the pressures required in the job. It was not the job I expected when I accepted the transfer.

> \* \* \* \*

> My transfer was not completed when I turned down the transfer. Relocation expenses were not completed. . . . If I had transferred, these transactions would have been com-

5

> pleted. I did get an advance on my old home to purchase a
> house in Zanesville. I am in the process of paying this back
> to Owens as I sell the two houses.

(J.A. 59-60) (emphasis added).

On May 18, 1994, Owens' Benefits Committee held a meeting to discuss, among other matters, the issues raised in Raines' letter. The minutes of the meeting read as follows:

> The Committee reviewed James C. Raines' request for
> Reduction In Force for retirement benefits and concluded
> that Mr. Raines had transferred to the Zanesville location
> and had resigned on his own volition; therefore, was not
> entitled to this provision of the plan. REQUEST DENIED.

(J.A. 63). The Benefits Committee informed Raines of its denial by letter dated May 19, 1994.

Raines subsequently filed this action against Owens to recover under ERISA early retirement benefits under the Retirement Plan and severance pay under the Termination Document.* According to Raines' complaint, he is entitled to a total of $400,000.00. Both parties subsequently moved for summary judgment. On September 17, 1997, the district court granted Owens' motion and denied Raines' motion. This appeal followed.

II.

Raines first contends that the district court erroneously granted summary judgment in favor of Owens on his claim for early retirement benefits under the Retirement Plan. We review the district court's grant of summary judgment in favor of Owens de novo, employing the same standards applied by the district court. See Sheppard & Enoch Pratt Hosp. v. Travelers Ins. Co. , 32 F.3d 120,

_____

*Raines initially brought this action in the Circuit Court of Cabell County, West Virginia. Owens subsequently removed the case to the United States District Court for the Southern District of West Virginia on the basis of federal question jurisdiction. See 28 U.S.C. § 1331.

123 (4th Cir. 1994). That we should only review the Benefits Committee's decision to deny Raines early retirement benefits for abuse of discretion is not in dispute. See Ellis v. Metropolitan Life Ins. Co., 126 F.3d 228, 232 (4th Cir. 1997) (holding that where the benefit plan grants the administrator or the plan fiduciary discretionary authority to determine eligibility or to construe the terms of the plan, the decision to deny benefits must be reviewed for abuse of discretion). Accordingly, as long as the Benefits Committee's decision to deny Raines' claim for early retirement benefits is the result of "a deliberate, principled reasoning process and if it is supported by substantial evidence," we must affirm the district court's grant of summary judgment in favor of Owens with respect to that claim. Brogan v. Holland, 105 F.3d 158, 161 (4th Cir. 1997).

Under the Retirement Plan, early retirement benefits were available

> to any Participant with ten or more Years of Credited Service whose employment with an Employer is terminated as a result of a change in the organization or operation of the Employer or as a result of a Reduction in Force and whose combined age and Years of Credited Service equals the number 65 or greater.

(J.A. 53-54). The Retirement Plan further provided that if an employee resigns, such employee is not eligible for early retirement benefits. From the record before it, the Benefits Committee found that Raines accepted a transfer to Owens' Zanesville facility as controller and subsequently resigned from that position, thus making himself ineligible for early retirement benefits under the terms of the Retirement Plan.

Raines argues that the Benefits Committee abused its discretion in finding that his transfer to Zanesville became effective prior to his informing Kunkle that he no longer desired to work at the Zanesville facility. According to Raines, the only plausible findings the Benefits Committee could have made from the evidence is that he either revoked his acceptance of the transfer offer prior to such transfer becoming effective or that he never actually completed the transfer. If the transfer never became effective, Raines reasons, he could not have possibly tendered a resignation from Owens when he informed

7

Kunkle that he no longer desired to work at the Zanesville facility. Raines' arguments are without merit.

The Benefits Committee's decision to deny Raines' claim for early retirement benefits is the result of a deliberate, principled reasoning process and is supported by substantial evidence. The Benefits Committee had before it evidence that at or near the time of the closure of the Huntington facility, Raines split his time between that facility and the Zanesville facility. Indeed, on October 17, 1993, Owens posted a notice at the Zanesville facility stating that Raines' transfer would be effective as of November 1, 1993. At the Zanesville facility, Raines occupied an office held by the former controller at that facility and the former controller trained Raines in the duties of that position. Raines applied for relocation expenses and purchased a home in the Zanesville area. Finally, in his May 6, 1994 letter to the Benefits Committee, Raines twice admits that he accepted a transfer to the Zanesville facility. Because Raines accepted the transfer to Zanesville in October 1993 and informed Kunkle that he no longer desired to work in Zanesville in March 1994, such admissions, taken with the other evidence, support the Benefits Committee's finding that Raines resigned from Owens. Accordingly, the Benefits Committee did not abuse its discretion by concluding that Raines was not entitled to early retirement benefits under the explicit terms of the Retirement Plan.

III.

Raines also contends that he is entitled to severance pay under the terms of the Termination Document distributed at the time of the Huntington facility's closing. Again, we review the district court's entry of summary judgment de novo, applying the same standards as the district court. See Sheppard, 32 F.3d at 123. The parties agree that the Termination Document does not confer discretion on the Benefits Committee with respect to determining an employee's eligibility for severance pay under that document. Accordingly, we review the Benefits Committee's decision denying Raines' claim for severance pay under the Termination Document de novo. See Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 114-15 (1989)("[A] denial of benefits . . . is to be reviewed under a de novo standard unless the benefit plan

8

gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.").

Of significance here, Question and Answer Four of the Termination Document provides,

> What if I am offered a transfer to another Company facility, but I refuse?
>
> Normally, if you are offered another job of an equal or higher evaluation level but refuse, no severance payment is permitted. However, since this is a plant closing, you will be eligible for severance pay regardless of your decision.

(J.A. 39). The Benefits Committee concluded that this language limits severance pay to Huntington employees who either declined transfers and thus left Owens, or who were never offered transfers, and were thus terminated by Owens. The issue before this court is whether the Benefits Committee's decision to deny Raines severance pay conflicts with the plain language of the Termination Document in its ordinary sense. See Jenkins v. Montgomery Indus., Inc. , 77 F.3d 740, 743 (4th Cir. 1996) ("Federal courts interpret ERISA regulated benefit plans without deferring to either party's interpretation, by using `ordinary principles of contract law and enforcing the plan's plain language in its ordinary sense.'" (internal citations omitted)) (quoting Bailey v. Blue Cross & Blue Shield of Virginia, 67 F.3d 53, 57 (4th Cir. 1995)). In addressing this issue, we must consider the Termination Document in its entirety, being careful not to read any of its language out of context. Alexander S. v. Boyd, 113 F.3d 1373, 1383 (4th Cir. 1997).

We hold that the Benefits Committee's decision does not conflict with the Termination Document in its ordinary sense, inasmuch as such language can only be read to provide that severance pay is not normally given to employees who are offered another job of equal or higher value but, since the Huntington plant was closing, employees offered lateral employment with Owens would not forfeit their severance pay benefits if they did not accept such an offer to transfer. To accept Raines' argument requires us to wholly ignore the meaning of the term "severance" in its ordinary sense, which New Webster's Dictionary of the English Language 883 (1985), defines as "the act of severing." Indeed the root word of severance,"sever," means "to part

9

or divide." Id. Obviously, Raines' remaining employed by Owens is at complete odds with these definitions.

The Termination Document, when viewed in its entirety, is clear that the severance pay provisions are meant to compensate displaced employees who either did not receive or did not accept offers of employment in other Owens facilities. Question and Answer Two of the same Termination Document states,

> What if I obtain other employment and have to leave prior to December 31?
>
> In order to qualify for severance and a part of next year's vacation pay as well as notice pay, you are expected to work until you are officially released. Based upon individual situations, you may be able to arrange an early release date with your supervisor. . . . In this case, you would qualify for severance, vacation payment and notice pay only up to the last day you worked.

(J.A. 39) (emphasis added). Obviously, for an employee to qualify for severance pay, Owens must sever the employment relationship with that employee by means of an official release. Viewing both Question and Answer Two and Four together, in accordance with our duty to view the Termination Document in its entirety, the Termination Document clearly provides that severance pay is meant only for displaced employees and not for employees like Raines who remained employed with Owens, albeit for a short period of time. Raines was not officially released from Owens, he accepted a transfer to its Zanesville facility and subsequently voluntarily resigned from Owens. Accordingly, under the explicit terms of the Termination Document, he does not qualify for severance pay.

In sum, we conclude that the district court properly granted summary judgment in favor of Owens on Raines' claim for severance pay under the Termination Document.

IV.

For the reasons stated herein, the judgment of the district court is affirmed.

AFFIRMED

10

NIEMEYER, Circuit Judge, concurring in part and dissenting in part:

In connection with the closing of its Huntington, West Virginia, plant, Owens-Brockway offered its employees at that plant various options with respect to benefits, including its retirement plan and severance plan. Ordinarily when an employee of Owens-Brockway was transferred from one plant to another, the employee was not entitled to receive severance pay. But in connection with the closing of its Huntington plant, Owens-Brockway modified its standard policy to provide a special benefit. In the Termination Document that Owens-Brockway circulated to the Huntington plant employees, it stated that the employees there would receive severance pay whether or not they elected to transfer to another plant. The document provided explicitly:

> What if I am offered a transfer to another Company facility, but I refuse?
>
> Normally, if you are offered another job of an equal or higher evaluation level but refuse, no severance pay is permitted. However, since this is a plant closing, <u>you will be eligible for severance pay regardless of your decision</u>.

(Emphasis added).

I agree with the majority opinion that in this case Raines accepted a transfer to Owens-Brockway's Zanesville, Ohio, facility and continued there as an employee of Owens-Brockway. Accordingly, I concur in Part II of the majority opinion that denies Raines early retirement benefits. However, the conclusion that Raines transferred from West Virginia to Ohio does not deny him the special plant-closing severance pay provided to all employees, "regardless of [the employee's] decision" to accept a transfer or not. Denying Raines the benefits promised by Owens-Brockway's Termination Document is particularly unfortunate for him given ERISA's mandate that any summary description of an employee benefit plan "be written in a manner calculated to be understood by the average plan participant, and . . . be sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan." 29 U.S.C. § 1022(a)(1). I would award Raines $32,237.52, the amount of his severance benefits as described in the Termination

11

Document. Accordingly, I dissent from Part III of the majority's opinion.

12