UNPUBLISHED

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

TROY HARRIS,

*Plaintiff-Appellee,*

v.

MICHAEL HOLLAND, Trustee; MARTY HUDSON, Trustee; JOSEPH BRENNAN, Trustee; B. V. HYLER, Trustee; TRUSTEES OF THE UNITED MINE WORKERS OF AMERICA 1974 PENSION PLAN,

*Defendants-Appellants.*

No. 02-2173

Appeal from the United States District Court
for the Western District of Virginia, at Big Stone Gap.
Glen M. Williams, Senior District Judge.
(CA-01-148-2)

Argued: October 29, 2003

Decided: February 4, 2004

Before WILLIAMS, MOTZ, and KING, Circuit Judges.

---

Affirmed by unpublished per curiam opinion. Judge Williams wrote a dissenting opinion.

---

## COUNSEL

**ARGUED:** Christopher Francis Clarke, Senior Assistant General Counsel, Office of the General Counsel, UMWA HEALTH AND

RETIREMENT FUNDS, Washington, D.C., for Appellants. Dawn Allison Mullins, LEE & PHIPPS, P.C., Wise, Virginia, for Appellee. **ON BRIEF:** Glenda S. Finch, Deputy General Counsel, Office of the General Counsel, UMWA HEALTH AND RETIREMENT FUNDS, Washington, D.C., for Appellants. Lewey K. Lee, Paul L. Phipps, LEE & PHIPPS, P.C., Wise, Virginia, for Appellee.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

## OPINION

PER CURIAM:

The Trustees of the United Mine Workers of America 1974 Pension Plan (the "Trustees") seek review of the district court's decision to award summary judgment in this benefits dispute to plaintiff Troy F. Harris, a disabled coal miner. *Harris v. Holland*, No. 2:01CV00148 (W.D. Va. Sept. 13, 2002) (the "Opinion"). By its Opinion, the court concluded that the Trustees had erred in denying Harris's claim for disability pension benefits. *Id.* As explained below, we agree with the district court and affirm.

### I.

### A.

On September 4, 1987, while working as a mine electrician for Island Creek Coal Company in southwestern Virginia, Harris injured his lower back while lifting a 250-pound bull gear (the "1987 Mine Incident"). As a result of this injury, Harris immediately fell to the ground and was later hospitalized. An orthopedic surgeon, Dr. Jean M. Eelma, initially diagnosed Harris's injury as a strain in the lumbar region of his back. Dr. Eelma discharged Harris three days later, on September 7, 1987, with instructions that he not return to work without her permission.

Harris returned to the hospital soon thereafter, on September 10, 1987, complaining of continuous pain in his lower back and episodes of numbness in both legs. Dr. Eelma observed that Harris suffered from "diffuse lumbar tenderness, worse at the L-5/S-1 level."[1] As a result, on September 16, 1987, an MRI was performed on Harris's lumbar spine. Based on the MRI, a radiologist diagnosed Harris with degenerative disc disease at the L-5/S-1 level, with disc bulging resulting in stenosis of the L-5 neural exit foramina.[2] The following day, September 17, 1987, Dr. Eelma also reviewed the MRI results and diagnosed Harris with a "fair sized disc herniation at the L-5/S-1 level."[3]

Harris returned to Dr. Eelma for followup appointments on October 8, 1987, and on October 29, 1987, during which he was treated for disc disease at the L-5/S-1 level. Finally, on November 12, 1987, Dr. Eelma gave Harris permission to return to his work in the coal mines. Although Harris worked the next day and on three subsequent days, he found his back pain to be intolerable. Two weeks later, Dr. Eelma determined that Harris had suffered a "flare of his degenerative disc disease," and she authorized him to leave work temporarily.

Before the end of the year, Harris returned to the hospital for four treatments of the injury he suffered in the 1987 Mine Incident — on November 30, and December 7, 21, and 30, 1987. Following a bone

---

[1]The symbol L-5 represents one of five lumbar vertebrae which are located between the thorax and the pelvis. *Dorland's Illustrated Medical Dictionary* 961 (28th ed. 1994). The symbol S-1 represents one of five sacral vertebrae which form the sacrum, a triangular bone located between the lumbar vertebrae and the coccyx. *Id.* at 347, 1479. The S-1 is located just below the L-5.

[2]Stenosis identifies the "narrowing or stricture of a duct or canal." *Dorland's Illustrated Medical Dictionary* 1576 (28th ed. 1994). Foramina is the plural of foramen, which means "a natural opening, or passage; a general term for such a passage, especially one into or through a bone." *Id.* at 648.

[3]The term herniation is used to describe "the abnormal protrusion of an organ or other body structure through a defect or natural opening in a covering, membrane, muscle, or bone." *Dorland's Illustrated Medical Dictionary* 759 (28th ed. 1994).

scan on December 30, 1987, doctors concluded that Harris suffered from degenerative osteoarthritis, "particularly evident at the level of L-5/S-1, with likely bulging of disc on right, and arthrosis of facets." On January 5, 1988, during yet another examination, Dr. Eelma observed that Harris had persistent low lumbar tenderness. Although she did not view Harris to be a surgical candidate, she opined that Harris could not "continue in his present state." Dr. Eelma therefore recommended that Harris see her for anti-inflammatory and pain reliever injections at the L-5/S-1 level, and Harris did so on January 8, 1988. Finally, after nearly fifteen hospital visits and related doctor examinations and treatments, Harris was authorized to again return to work, which he did on February 22, 1988.

In 1995 and 1996, Harris was injured in two other incidents while working in the coal mines. First, on February 25, 1995, Harris injured his neck when he hit his head on a piece of mining equipment (the "1995 Mine Incident"). Harris nevertheless remained on the job and received no first-aid treatment. Second, on November 8, 1996, while attempting to lift a 150-pound piece of emonorail, Harris felt a sharp pain in his lower back (the "1996 Mine Incident"). As a result, Harris visited the hospital and was treated by Dr. Joshua P. Sutherland, Jr., a general practitioner. A back x-ray revealed degenerative changes in Harris's lower back, and he received injections for back pain and was diagnosed with lumbar strain.

After approximately twenty-four years in the coal mines, Harris ceased working for Island Creek in February of 1997. On June 19, 1997, while pushing a lawnmower, Harris felt sharp pain in his lower back, accompanied by pain in his right hip, radiation down his leg and groin, and stomach pain (the "Lawnmower Incident"). Harris visited the hospital the next day, where he advised the attending physicians that he had been experiencing back problems since the 1987 Mine Incident. A radiologist took x-rays of Harris's spine and reported degenerative changes in the lumbar region.

On June 23, 1997, Harris returned to the hospital for a followup examination in connection with the Lawnmower Incident. Dr. Sutherland again examined Harris, and he reported that Harris suffered from a severely decreased range of motion in his lumbar spine. Following an MRI, a radiologist observed disc protrusion at the L-5/S-1 level.

Harris continued to see Dr. Sutherland for monthly followup examinations until May of 1998. As a result, Dr. Sutherland concluded that Harris was unable to work and that he was totally disabled. On March 16, 2000, in writing to the Trustees, Dr. Sutherland opined that "[t]he patient [Harris] is unable to do gainful employment as a direct result of advanced degenerative lumbar disc dysfunction" (the "Dr. Sutherland Letter").

B.

On August 8, 1997, Harris applied for Social Security Disability Insurance ("SSDI") benefits. The appropriate state agency denied Harris's application for benefits on October 22, 1997, and that denial was upheld on January 20, 1998. Harris then requested an administrative hearing and, in September 1998, an Administrative Law Judge ("ALJ") changed the initial decision and approved Harris's application for SSDI benefits. In so doing, the ALJ concluded that Harris had been permanently disabled since the Lawnmower Incident, and he found that Harris's "severe impairments" were "residuals of traumatic low back injury with radiculopathy in the lower extremities; arthritis in the neck, arms, and hands; and situational depression."[4] *In re Harris*, Decision of Social Security Administration (Sept. 8, 1998).

On January 11, 1999, Harris applied to the Trustees for an award of disability pension benefits pursuant to the 1974 Pension Plan.[5] The

---

[4]The term traumatic refers generally to "a wound or injury." *Dorland's Illustrated Medical Dictionary* 1735 (28th ed. 1994). Radiculopathy is used to describe a "disease of the nerve roots." *Id.* at 1404.

[5]The 1974 Pension Plan governs the 1974 Pension Trust, which is a multi-employer employee pension plan covered by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001-1461. The 1974 Pension Plan provides benefits to plan participants who become totally disabled as a result of mine accidents. It provides, in relevant part:

> A Participant who (a) has at least 10 years of signatory service prior to retirement, and (b) becomes totally disabled as a result of a mine accident . . . shall, upon retirement . . . be eligible for a pension while so disabled. A Participant shall be considered to be totally disabled only if by reason of such accident such Participant is subsequently determined to be eligible for Social Security Disability Insurance Benefits. . . .

1974 Pension Plan, Art. II pt. C.

Trustees' Disability Pension Analyst, a registered nurse (the "Nurse Analyst"), denied Harris's claim, relying on interpretive guidelines promulgated by the Trustees.[6] These guidelines are in question and answer format ("Funds Q&As"), and they provide for the consistent interpretation and application of the 1974 Pension Plan. The specific Funds Q&A of concern here, Funds Q&A 252, provides, inter alia, that a "disability must have been caused by the exertion or impact of some external physical force or object against the body or by the exertion *or* impact of the body against some external physical object . . . ." Funds Q&A 252(3).[7] The Nurse Analyst relied on this provision in deciding that the 1987 Mine Incident was not a "mine accident" under the 1974 Pension Plan. She based her decision on the premise that Harris was not in the process of lifting the bull gear when his 1987 injury occurred.

---

[6]The 1974 Pension Plan authorizes the Trustees to "promulgate rules and regulations to implement this Plan . . . ." 1974 Pension Plan, Art. VIII pt. B.1.

[7]Pursuant to the guidelines promulgated by the Trustees, a miner is totally disabled as a result of a mine accident if three conditions are satisfied. The miner's disability must satisfy the criteria of (1) unexpectedness, (2) definiteness, and (3) force or impact. More specifically, Funds Q&A 252 provides as follows:

> Q.   The 1950 and 1974 Benefit and Pension Plans provide benefits to certain persons who are totally disabled as a result of a mine accident. For purposes of these provisions, what test must be met for a finding that a miner was "disabled as the result of a mine accident?"

> A.   The following three characteristics must be present: (1) *Unexpectedness*: The disability must have been unlooked for and unforseen; (2) *Definiteness*: The disability must be traceable to a definite time, place, and occasion which occurred within the course of the mine worker's employment. A progressive disease does not meet this test and therefore cannot be a disability that resulted from a mine accident; (3) *Force or Impact*: The disability must have been caused by the exertion or impact of some external physical force or object against the body or by the exertion *or* impact of the body against some external physical object; i.e., not simply as a result of the mine worker's own physical condition.

Funds Q&A 252.

The Nurse Analyst further concluded that, even if the 1987 Mine Incident constituted a mine accident under the 1974 Pension Plan, the medical evidence failed to establish that the 1987 Mine Incident had resulted in Harris's disability. The Nurse Analyst also rejected Harris's claim that the 1996 Mine Incident had caused his disability, concluding that the Lawnmower Incident was solely responsible for Harris's disability. On February 9, 2000, the Nurse Analyst, acting on behalf of the Trustees, denied Harris's claim.

About a month later, on March 16, 2000, the Trustees received the Dr. Sutherland Letter regarding Harris's back problems. Dr. Sutherland opined that "Mr. Harris's current presenting complaints and qualifications for disability is [sic] directly related to the injury of 1987 . . . . There is a direct cause and effect associated with the patient's present back pain and the injury of 1987." A week thereafter, on March 24, 2000, a Program Specialist for the Trustees sent Harris another denial letter, stating simply:

> We regret to inform you that the letter submitted by Dr. Sutherland dated March 16, 2000 does not add any new information to your disability case. The letter will be added to your file and your disability pension remains denied.

On May 5, 2000, Harris requested that the Trustees conduct a hearing on his claim for benefits. Accompanying this request, Harris submitted, for the first time, a copy of the accident report on the 1996 Mine Incident. The Nurse Analyst again recommended the denial of benefits, asserting that the accident report failed to establish a causal link between the 1996 Mine Incident and Harris's disability, and again asserting that the 1987 Mine Incident was not a mine accident. Although the Nurse Analyst reviewed Harris's entire file, she failed to mention the Dr. Sutherland Letter, and she accordingly failed to assess its impact on Harris's claim for disability benefits. On July 27, 2000, Harris was again notified by the Trustees that his claim for benefits was denied.

In October of 2000, Harris requested that the Trustees reconsider his claim for disability benefits and, in support thereof, submitted an accident report on the 1995 Mine Incident. In response, the Nurse Analyst conducted another review of Harris's file and, on November

30, 2000, she again recommended the denial of Harris's claim. As bases therefore, she asserted the following: (1) no treatment records were on file for the 1995 Mine Incident, and it therefore could not have caused Harris's disability; (2) Harris continued to work after the 1996 Mine Incident, and it thus could not have caused his disability; and (3) the 1987 Mine Incident did not constitute a mine accident under the 1974 Pension Plan. Although the Nurse Analyst acknowledged the existence of the Dr. Sutherland Letter, she did not make any findings or draw any conclusions concerning its contents.

On February 5, 2001, Harris was informed by the Trustees' Hearing Officer that he would receive a hearing concerning the Nurse Analyst's finding that the 1987 Mine Incident did not constitute a mine accident under the 1974 Pension Plan. During a March 27, 2001, telephonic hearing on this issue, Harris and Glenn Herbert, a coworker and an eyewitness to the 1987 Mine Incident, each testified as to the specific events of that day. Herbert, who was aiding Harris in lifting the bull gear, testified that, contrary to the finding of the Nurse Analyst, Harris was in the process of lifting the bull gear when his back was injured.[8] In light of this evidence, the Hearing Officer overruled the Nurse Analyst and found that Harris was in the process of lifting the bull gear when he injured his back. Based upon this finding, the Hearing officer reversed the Trustees on the 1987 Mine Incident, concluding that it constituted a "mine accident" under Funds Q&A 252.

In light of the Hearing Officer's decision, the Trustees reconsidered Harris's claim for disability pension benefits. Once again, however, the Nurse Analyst recommended denying Harris's claim. On this occasion, she asserted that, although the 1987 Mine Incident constituted a mine accident under the 1974 Pension Plan, it did not result in Harris's disability. Her conclusion on this point was premised solely on the fact that Harris was able to perform his regular work duties, without further treatment on his injured back, from January of 1988 until February of 1998. The Nurse Analyst asserted that this fact

---

[8]Harris also submitted affidavits to the Hearing Officer from three other employees, the Shift Foreman, the Lampman and the Loadout Operator. All three assisted in transporting Harris out of the mine after he was injured; however, none witnessed the accident.

mandated the conclusion that the 1987 mine accident did not result in Harris's disability. Again, however, she made no analysis with respect to the Dr. Sutherland Letter, stating only that "[a]lthough Dr. Sutherland drew a direct relationship between the 1987 injury and the disability of June 21, 1997, the records do not support this conclusion." As a result, the Trustees, on June 12, 2001, again denied Harris's claim for disability benefits.

On December 10, 2001, Harris appealed the Trustees' decision to the district court for the Western District of Virginia. On September 13, 2002, that court reversed the Trustees and awarded summary judgment to Harris, thereby granting disability pension benefits to him. *Harris v. Holland*, No. 2:01CV00148 (W.D. Va. Sept. 13, 2002). The Trustees have filed a timely notice of appeal, and we possess jurisdiction pursuant to 28 U.S.C. § 1291.

## II.

We review de novo a district court's award of summary judgment, employing the same standards applied by the district court. *Brogan v. Holland*, 105 F.3d 158, 161 (4th Cir. 1997). When benefits plan trustees are vested with discretionary authority concerning eligibility for benefits, a reviewing court examines their decisions for abuse of discretion. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 111 (1989). Because the Trustees exercise such discretion, we review their denial of disability benefits for abuse of discretion, and a decision of the Trustees is not to be disturbed if it is supported by substantial evidence. *See Bernstein v. CapitalCare, Inc.*, 70 F.3d 783, 787-88 (4th Cir. 1995).

## III.

Pursuant to the 1974 Pension Plan, an applicant for a disability pension must, in order to secure benefits, satisfy three criteria: (1) he must be totally disabled, as evidenced by an SSDI award; (2) he must have been injured in a mine accident; and (3) he must demonstrate that his disability is "a result of a mine accident." *See* 1974 Pension Plan, Art. II pt. C. The parties agree that the first two elements of this three-part test are satisfied, i.e., (1) Harris is disabled, as evidenced by his SSDI award; and (2) the 1987 Mine Incident constitutes a mine

accident. The sole issue in this appeal concerns the third criterion — whether Harris's disability was a result of the mine accident. As explained below, we agree with the district court that the 1987 Mine Incident resulted in Harris's disability, and we also agree that the Trustees' decision is not supported by substantial evidence.[9]

A.

In their appeal, the Trustees maintain that the 1987 Mine Incident did not result in Harris's disability because he thereafter worked in the mines for ten years without receiving further treatment for his 1987 back injury. In order to properly assess this contention, we must analyze and apply our precedents in *Boyd v. Trustees of the United Mine Workers Health & Retirement Funds*, 873 F.2d 57 (4th Cir. 1989), and *Robertson v. Connors*, 848 F.2d 472 (4th Cir. 1988), which discuss the proper procedures for determining whether a mine accident resulted in disability under the 1974 Pension Plan.

In our *Robertson* decision, the claimant had strained his neck in 1980 when he was thrown from a coal shuttle car. *Robertson*, 848 F.2d at 473. Robertson subsequently received an SSDI award dating back to his mine accident, but the Trustees nevertheless denied his claim for benefits under the 1974 Pension Plan. They reasoned that Robertson had been hospitalized for anxiety and tension in 1972, for a neck injury in 1977, and for chest pains in 1979, and that his physical and psychological ailments thus existed prior to the 1980 mine accident. *Id.* at 474 & n.2. On appeal, however, we ruled that the proper analysis in such a proceeding is not whether the mine accident was the sole cause of disability, or even the most significant cause thereof, but whether the mine accident was a *proximate cause* of disability. *Id.* at 475. As Judge Sprouse explained:

> The only reasonable interpretation of the requirement that total disability be 'the result of a mine accident,' therefore, is that it requires total disability to have been proximately caused by the mine accident. That is, *if the plaintiff was*

---

[9]Because we agree with the district court that the 1987 Mine Incident caused Harris's disability, we need not assess whether the 1995 or 1996 Mine Incidents also resulted in his disability.

*injured in a mine accident and that injury, whether in com-bination with a previous or subsequent condition, is sub-stantially responsible for plaintiff's inability to perform his job . . . then his total disability results from a mine accident.*

*Id.* (quoting *Horn v. Mullins*, 498 F. Supp. 1197, 1200 (W.D. Va. 1980), *aff'd*, 650 F.2d 35 (4th Cir. 1981)) (emphasis added). Although Robertson's mine accident caused a relatively minor neck injury, and although his neck injury aggravated an earlier non-mine-related neck injury, we found that his accident was nevertheless substantially responsible for his disability. And, because a disability need not be solely caused by a mine accident in order to be "the result of a mine accident," Robertson was entitled to benefits under the 1974 Pension Plan. Accordingly, we reversed the district court, which had upheld the Trustees' denial of disability benefits.

We also addressed the causation analysis process in our 1989 *Boyd* decision. In *Boyd*, the claimant had suffered a cervical spine sprain when timber fell on her shoulder while she worked in the coal mines. *Boyd*, 873 F.2d at 58. Boyd was later awarded SSDI benefits based on her mental and emotional impairments. *Id.* The Trustees denied benefits to Boyd under the 1974 Pension Plan, however, on the ground that her mine accident did not result in disability because her symptoms had appeared three years earlier when she was injured in an automobile accident. *Id.* at 58-59. We again reversed the denial of benefits, emphasizing the reasoning of *Robertson. See id.* at 59. As we observed, "[w]hatever the contributions of her prior mental and emotional condition and whatever the actual physical injury directly suffered in the mine accident, Boyd's mine accident was 'substan-tially responsible' for her total disability as found for SSDI purposes." *Id.* at 60.

The Trustees' denial of Harris's claim for benefits contravenes the mandate of *Robertson* and *Boyd*. First, the fact that Harris was able to return to work following the 1987 mine accident does not necessar-ily mean that the accident was not substantially responsible for his disability. While the 1987 Mine Incident may not have been the sole cause of Harris's disability, the proper inquiry is whether the accident was substantially responsible for his disability, not whether it was last in chronological order. *Boyd* and *Robertson* support the proposition

that a mine accident can result in the total disability of a miner, even though it combined with a previous (as in *Boyd* and *Robertson*) or subsequent injury (as in this case).[10] *Boyd*, 873 F.2d at 59; *Robertson*, 848 F.2d at 475. Although the 1987 Mine Incident may have combined with the Lawnmower Incident and the other two incidents to render Harris totally disabled, the 1987 accident is nonetheless substantially responsible for Harris's disability. As the district court explained, "clearly that first back injury in 1987 was a continuous problem until a final exam by Doctors in 1998. The first Doctor who saw Claimant found that he had, according to the MRI, a disc problem at L-5/S-1 and the last Doctor who treated claimant found he had a disc problem at L-5/S-1." Opinion at 15. Importantly, the ALJ concluded that Harris was permanently disabled as a result of a "traumatic" (i.e., "a wound or injury") low back injury. It is thus illogical to conclude that Harris's 1987 traumatic low back injury, for which he was treated approximately fifteen times, was not a proximate cause of his permanent disability.

It is not insignificant to our analysis that the Trustees disregarded the opinion of Dr. Sutherland. In his letter, Dr. Sutherland opined that "Mr. Harris' current presenting complaints and qualifications for disability is [sic] directly related to the injury of 1987." Although we cannot and do not mandate that the Trustees accord special weight to the views of a claimant's treating physician, the Trustees are not entitled to "arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Black & Decker Disability Plan v. Nord*, 123 S. Ct. 1965, 1972 (2003). And although we cannot "impose on plan administrators a discrete burden of explana-

---

[10]The circumstances underlying the *Robertson* and *Boyd* decisions differ slightly from the circumstances here. In those situations, the Social Security Administration determined that the applicant's disability commenced on the date of his mine accident. Here, the ALJ concluded that Harris's disability commenced on the date of the Lawnmower Incident. Both *Robertson* and *Boyd* make clear, however, that an applicant's disability onset date need not be the same as his mine accident. The proper inquiry is whether the mine accident proximately caused the disability, even if the accident combined with a subsequent non-mine-related accident to render the miner totally disabled. *See Boyd*, 873 F.2d at 59; *Robertson*, 848 F.2d at 475.

tion when they credit reliable evidence that conflicts with a treating physician's evaluation," *id.*, we are obliged to ensure that the Trustees "'provide adequate notice in writing to any participant or beneficiary whose claim for benefits . . . has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant.'" *Id.* at 1970 (quoting 29 U.S.C. § 1133(1)). In this setting, the Trustees simply decided to ignore the essentials of the Dr. Sutherland Letter, and they failed to provide any basis for doing so.[11] As the district court aptly explained, "Dr. Sutherland has treated the plaintiff for some years during the time he has received his social security, and his opinion . . . would be entitled to great weight in this case. The trustees apparently have given no consideration whatsoever to Dr. Sutherlands [sic] opinion." Opinion at 3. Because the Trustees ignored Dr. Sutherland's opinion, they failed to properly analyze the proximate cause issue.

## B.

Finally, the Trustees maintain that a progressive disease, such as degenerative disc disease, is specifically excluded from the 1974 Pension Plan. Pursuant to Funds Q&A 252(2), a miner is totally disabled as a result of a mine accident only if his disability is *definite*, meaning that it is "traceable to a definite time, place, and occasion which occurred within the course of the mine worker's employment." Funds Q&A 252(2) goes on to exclude progressive diseases from this definition, stating that "[a] progressive disease does not meet this test and therefore cannot be a disability that resulted from a mine accident." In light of the progressive disease proviso in Funds Q&A 252(2), the Trustees contend that Harris's disability resulted from a degenerative process not covered by the 1974 Pension Plan. To the contrary, however, the Trustees failed to properly apply the guidelines it adopted in Funds Q&A 252(2). As explained below, its progressive disease proviso does not apply to the circumstances underlying Harris's claim.

---

[11]We note with interest the paradox that, although the Nurse Analyst ignored Dr. Sutherland's conclusion that the 1987 Mine Incident caused Harris's disability, she relied heavily on Dr. Sutherland's views in reaching her conclusions as to Harris's medical condition.

As we have previously explained, "the 'progressive diseases' proviso should be read not as an exception to the [enumerated] . . . example[s] in Q&A 252[ ], but rather as an instruction on how to handle situations that do not fall into any of the enumerated examples of 'mine accidents' in Q & A 252." *Richards v. United Mine Workers of Am. Health & Ret. Fund*, 895 F.2d 133, 137 (4th Cir. 1990). In *Richards*, the claimant suffered chest pains while lifting a hundred pounds of timber at a mine site. He was later hospitalized, and the doctors advised him that he had experienced a heart attack and suffered from progressive heart disease. *Id.* at 134. Relying on the progressive disease proviso, the Trustees contended that heart disease, not mine work, caused Richards to suffer his heart attack, and they denied his claim for benefits. *Id.* at 136. The district court reversed, and we agreed with the district court. We explained that, under the example found in Funds Q&A 252(k), a mine accident occurs when "'a miner suffers a heart attack while pushing a heavy object in the normal course of his job.'" *Id.* at 137 (quoting Funds Q&A 252(k)). Because Richards was lifting a heavy object at the mine site when his heart attack occurred, he fell within the example enumerated in Funds Q&A 252(k), and the progressive disease proviso did not apply. *Id.* As we further explained, "[i]n essence, Q&A 252(k) establishes that heart attacks that occur during heavy lifting in the mines are caused in substantial part by the miner's work. If the conditions of Q & A 252(k) are met, the Trustees are foreclosed from further inquiry into the actual cause of the heart attack." *Id.*

The logic of *Richards* applies with equal force here. Under the example set forth by the Trustees in Funds Q&A 252(j), a coal miner is disabled as a result of a mine accident if he "injures his back lifting a heavy object in the normal course of his job." This is precisely what happened to Harris in the 1987 Mine Incident. The Hearing Officer, in her decision, specifically found that Harris was lifting the 250-pound bull gear when he injured his back in 1987. Harris's condition therefore falls under the example enumerated in Funds Q&A 252(j), because he was injured while "lifting a heavy object in the normal course of his job" in the coal mines. Accordingly, the progressive disease proviso does not apply to Harris's claim, and his disability satisfies the requirement of definiteness in Funds Q&A 252(2). Therefore, the Trustees' contention on this point must also be rejected.

IV.

Pursuant to the foregoing, we affirm the Opinion of the

*AFFIRMED*

WILLIAMS, Circuit Judge, dissenting:

In this case, our sole duty is to determine whether the Trustees' decision to deny Harris benefits was an abuse of discretion. Whether the Trustees abused their discretion turns, in this case, on whether their determination that Harris's disability was not caused by a mine injury was supported by substantial evidence. Because I conclude that the Trustees' decision was supported by substantial evidence, and because I believe that my colleagues in the majority apply the now-discredited treating physician rule, I respectfully dissent.

I.

I essentially agree with the majority's recitation of the facts, so I will recount only those facts that I believe that my colleagues omit or de-emphasize. Harris unquestionably injured his back in a mine accident in September of 1987. As the majority notes, he received various treatments for the back injury during the four months following the accident, and in the course of those treatments, he was diagnosed with degenerative disc disease, a form of osteoarthritis.[1] By November, Harris was "quite a bit better" and "anxious to return to work." (J.A. at 220.) He suffered a relapse, however, which his physician attributed to "a flare of his degenerative disc disease." (J.A. at 221.) He then underwent a bone scan, because his physician was concerned about the possibility of "arthritic change." (J.A. at 223.) The bone scan confirmed the earlier diagnosis of osteoarthritis. After January of 1988, Harris received no additional medical treatment for his back for nearly nine years. During this time, he continued to be actively employed as a miner.

---

[1]Osteoarthritis is "a noninflammatory degenerative joint disease . . . characterized by degeneration of the articular cartilage, hypertrophy of bone at the margins, and changes in the synovial membrane." *Dorland's Illustrated Medical Dictionary* 1286 (29th ed. 2000).

During the 1990's, Harris was involved in two other minor mine accidents. In February of 1995, Harris ran into a brow and "stove [his] neck." (J.A. at 43.) He required no medical treatment after this accident and remained on the job until the end of his shift. In November of 1996, Harris injured his back while attempting to lift the end of a monorail. The injury occurred at 1:50 A.M., and Harris continued working until the end of his shift. He did not seek medical attention until 11:30 A.M., over nine hours after the accident, at which time he was diagnosed with a lumbar strain.

Despite these accidents, Harris continued to work as a miner until he was laid off in February of 1997. He sought no medical treatment for his back between the time he was laid off and June 16, 1997, when he severely injured his back on June 16, 1997, while mowing his lawn. After the lawn-mowing accident, Harris's range of motion in his legs and back was greatly decreased, and he was in substantial pain. He was subsequently treated for muscle spasms and acute sciatica.[2] He was once again diagnosed with degenerative osteoarthritis in August 1997. His treating physician, Dr. Sutherland, opined that Harris was "totally disable[d] . . . due to lumbar disc syndrome from 6-19-97." (J.A. at 261.) In September, Sutherland diagnosed Harris with "advanced degenerative joint disease," "lumbar disc syndrome," "bilateral sciatica," and "chronic pain disorder." (J.A. at 262.)

Harris applied for an award of Social Security Disability Insurance Benefits (SSDI) in August 1997. An administrative law judge (ALJ) determined that Harris was totally disabled and thus qualified for SSDI. The ALJ attributed Harris's disability to "residuals of traumatic low back injury with radiculopathy[3] in the lower extremities; arthritis in the neck, arms, and hands; and situational depression." (J.A. at 147.) Notably, the ALJ determined that Harris had been disabled since June 21, 1997, a few days after Harris's lawn-mowing accident.

---

[2]Sciatica is "a syndrome characterized by pain radiating from the back into the buttock and into the lower extremity." *Dorland's Illustrated Medical Dictionary* 1609 (29th ed. 2000). It is "most commonly caused by protrusion of a low lumbar intervertebral disk." *Id.*

[3]Radiculopathy is "a disease of the nerve roots." *Dorland's Illustrated Medical Dictionary* 1511 (29th ed. 2000).

Harris then applied to the Trustees for a disability pension. The Trustees denied Harris's application. They concluded that to the extent Harris's disability was attributable to "traumatic low back injury," "the disability . . . [wa]s related to the non-work-related [i.e., lawn-mowing] injury of June 1997." (J.A. at 32.) They concluded that "the records d[id] not support [Dr. Sutherland's] conclusion" that there was a "direct relationship between the 1987 injury and the disability of June 21, 1997." (J.A. at 32.) Specifically, the Trustees determined that, given Harris's "work history and lack of evidence of [ongoing] back problem[s]," it "would not be reasonable to infer" that Harris's disability was related to the "back injuries of 1987 and 1996" as opposed to the back injury of 1997. (J.A. at 32.)

## II.

## A.

When an ERISA disability pension plan commits eligibility determinations to the discretion of the plan administrator or fiduciary, we review those determinations for abuse of discretion. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). "It is well-established that the abuse of discretion standard under [*Firestone]* is applicable to our review of the Trustees' decisions under the UMWA pension plans." *Hale v. Tr. of United Mine Workers of Am. Health & Retirement Funds*, 23 F.3d 899, 901(4th Cir. 1994). Under this standard, "we will not disturb such a decision if it is reasonable." *Booth v. Wal-Mart Stores, Inc. Associates Health and Welfare Plan*, 201 F.3d 335, 342 (4th Cir. 2000).

Although we may consider many factors in determining the reasonableness of a fiduciary's discretionary decision, *see Booth*, 201 F.3d at 342-343; *Brogan v. Holland*, 105 F.3d 158, 161 (4th Cir. 1997); *Lockhart v. United Mine Workers of Am. 1974 Pension Trust*, 5 F.3d 74, 77 (4th Cir. 1993), the only factor at issue here is the degree to which the considered materials support the Trustees' decision. *See Booth*, 201 F.3d at 342. In other words, given the facts of this case, the Trustees' decision is reasonable if it is supported by substantial evidence. *See Bernstein v. CapitalCare, Inc.*, 70 F.3d 783, 788 (4th Cir. 1995).

### B.

In order to be eligible for a disability pension under the 1974 UMWA pension plan, a claimant must establish three things. *See Boyd v. Tr. of United Mine Workers Health & Retirement Funds*, 873 F.2d 57, 59 (4th Cir. 1989). First, the claimant must establish that he was involved in a mine accident. *Id.* Second, he must show that he has been awarded SSDI disability benefits, thus conclusively establishing that he has a disability ("Qualifying Disability"). *Id.* at 58. Finally, he must prove that the mine accident proximately caused, or was substantially responsible for, the Qualifying Disability. *Id.* at 59; *Robertson v. Connors*, 848 F.2d 472, 475 (4th Cir. 1988).

As my colleagues note, the Trustees use a set of questions and answers, called "Q & As," to help them interpret the terms of the 1974 pension plan. *See Brogan*, 105 F.3d at 162. We "afford the Trustees' interpretation of these rules the same deference that we give the Trustees' interpretation of the language of the Plan itself." *Id.* According to Q & A 252, "miners who become disabled by progressive diseases or conditions such as black lung, silicosis, tuberculosis, arthritis, rheumatism, etc., cannot be considered 'disabled as the result of a mine accident.'" Q & A 252; (Supp. J.A. at 2.). When a progressive disease combines with a mine accident to proximately cause a claimant's Qualifying Disability, however, the claimant is eligible for a disability pension. *See Richards*, 895 F.2d at 136-137 (explaining that Q & A 252(k) requires benefits when a mine worker "suffers a heart attack while pushing a heavy object in the normal course of his job"); *Chicarelli v. UMWA Health & Ret. Funds*, 943 F.2d 457, 462 (4th Cir. 1991) (same).

In determining whether the Trustees' decision is reasonable, we accord great weight to the disability date specified in an SSDI award when ascertaining the date and cause of a Qualifying Disability. *Richards*, 895 F.2d at 138; *Horn v. Mullins*, 650 F.2d 35, 37 (4th Cir. 1981). In fact, we have described the "date of disability determined by the ALJ" as the "critical factor" to be considered when deciding whether substantial evidence supports the Trustees' decision. *Horn*, 650 F.2d at 37. This "critical factor" clearly supports the Trustees' decision in this case. The ALJ found the date of disability to be June 21, 1997, within four days of the lawn-mowing accident, but almost

ten years after the mine accident. Moreover, in addition to bring consistent with the ALJ's determination, the Trustees' conclusion is supported by the following undisputed facts:

- Harris continued to work following each of his three mine accidents until he was laid off in 1997;

- Harris had been diagnosed with a progressive disease, osteoarthritis of the spine, several times since 1987;

- Harris continued working in the mines for nearly ten years after his first, and most severe, mine accident;

- After treatment for the 1987 mine accident ended in January 1988, and prior to his lawn-mowing accident, Harris sought medical treatment for back pain on only one day, the day of the 1996 mine accident;

- Dr. Sutherland, Harris's treating physician, opined that Harris was "totally disable[d] . . . from 6-19-97," three days after the lawn-mowing accident (J.A. at 260-61);

- The ALJ attributed Harris's disability to a combination of arthritis, lower back trauma, and depression;

- Dr. Sutherland, the only doctor to opine that the 1987 mine accident caused Harris's disability, did not first evaluate Harris until nearly ten years after the accident;

- Harris has required extensive, continuing medical treatment since the lawn-mowing accident, but he did not require such treatment before the accident; and

- Harris has been unable to work since the lawn-mowing accident, but he was able to work before the accident.

In the face of this evidence, substantial evidence supported the Trustees' decision, and it was reasonable for the Trustees to conclude that Harris's disability was caused by a combination of his osteoarthritis

and the lawn-mowing accident, not a mine accident.[4] Instead of noting the abundance of evidence supporting the Trustees' determination, the majority engages in a *de novo* fact-finding expedition and determines that the 1987 mine accident substantially caused Harris's disability.[5] Even if we were reviewing the Trustees' decision *de novo*,

[4]Because my colleagues focus exclusively on the 1987 mine accident, I focus on that accident as well. I wish to note however, that there is absolutely no evidence that the later two mine accidents, neither of which were severe enough to require Harris to leave work, contributed in any way to his disability. Accordingly, substantial evidence supports the Trustees' decision that these minor accidents did not substantially cause Harris's disability.

[5]The majority relies heavily on our opinions in *Robertson* and *Boyd*, holding that the Trustees' decision contravenes the "mandate" of those cases. *See Robertson v. Connors*, 848 F.2d 472 (4th Cir. 1988); *Boyd v. Trs. of United Mine Workers Health & Ret. Funds*, 873 F.2d 57 (4th Cir. 1989). Although the majority accurately states the facts and holdings of those cases, they fail to explain how those cases are relevant here. The parties did not dispute, nor do I, that a mine accident can substantially cause a Qualifying Disability even if it is not the sole cause of that disability. This rather unremarkable proposition of law, however, does not help us determine whether the Trustees' decision in this case was supported by substantial evidence. Moreover, if my colleagues mean to imply that *Boyd* and *Robertson* are factually similar to this case, they simply are mistaken. The majority relegates to a footnote what we have called the "critical factor" in lower back injury cases — in both of those cases, the ALJ determined that the miners had become disabled on or near *the date of their mine accidents. See Robertson*, 848 F.2d at 475 n.2 ("Our decision is bolstered by the ALJ's determination that Social Security disability for Robertson's depressive syndrome commenced on the date of the mine accident."); *Boyd*, 873 F.2d at 58 (noting that the ALJ determined that Boyd was disabled since 1983 following her 1982 mine accident). In this case, that same "critical factor" supports the Trustees' decision — the ALJ determined that Harris became disabled within days of his lawn-mowing accident. Moreover, unlike Harris, both Robertson and Boyd persistently complained of debilitating pain from the date of their mine injuries, and neither was able to return to work for any substantial period of time after his or her mine accident. *See Robertson*, 848 F.2d at 476 ("Importantly, however, prior to the mine accident, [the mine worker's] manifestations of pain did not prevent his return to work."); *Boyd*, 873 F.2d at 60 ("[F]rom the date of her mine injury in July 1982, Boyd continuously complained of debilitating pain, repeatedly sought medical assistance for this pain, and finally was unable to continue work.").

however, the evidence relied upon by the majority would provide slim support for its conclusion.

First, the majority quotes with approval the district court's finding that "clearly the first back injury in 1987 was a continuous problem until a final exam by Doctors in 1998." *Ante* at 12. To the contrary, I believe that it is anything but "clear" that Harris had a continuous problem with his back following the 1987 injury. Harris sought absolutely *no* medical treatment for his back during the nine years after the accident, and he continued his employment in the mines during the same period. In my mind, this hardly evidences a "continuous problem."

Next, the majority again quotes with approval the district court's finding that "the first Doctor who saw [Harris] found that he had . . . a disc problem at L-5/S-1 and the last Doctor who treated [Harris] found he had a disc problem at L-5/S-1." *Ante* at 12. While this statement is true, the majority fails to note that the "disc problem" found by the doctors was *degenerative osteoarthritis*, a progressive disease that can never be caused by a mine accident. I fail to understand how the fact that Harris had osteoarthritis at L-5/S-1 in 1987 and continued to have it in 1998 is at all relevant. Because osteoarthritis is a progressive disease, one would expect Harris's osteoarthritis to have worsened during the time period between 1987 and 1998, which it in fact did. A doctor's finding that Harris had osteoarthritis at L-5/S-1 in 1998 is thus quite unextraordinary and does not increase the likelihood that Harris's disability was caused by the 1987 mine accident. Furthermore, because degenerative osteoarthritis is a progressive disease that cannot be caused by a mine accident, it is unclear how these findings support the majority's analysis.

My colleagues also believe that "[i]t is . . . illogical to conclude that Harris's 1987 traumatic low back injury . . . was not a proximate cause of his permanent disability," because "the ALJ concluded that Harris was permanently disabled as a result of a 'traumatic' . . . low back injury." *Ante* at 12. The majority fails to explain why it is logical to assume that the trauma to which the ALJ referred was a ten-year-old mine accident, for which Harris had not sought medical treatment in almost a decade, rather than the lawn-mowing injury that occurred just days before Harris became totally disabled. Indeed, I believe that

the only reasonable conclusion to draw from the date of disability specified in the SSDI award, is that the "trauma" to which it refers is the lawn-mowing accident.

The final arrow in my colleagues' quiver is Dr. Sutherland's letter, in which he opined that "Mr. Harris's . . . disability is directly related to the injury of 1987." (J.A. at 287.) The majority avers that the Trustees "ignore[d] the essentials of . . . Dr. Sutherland['s] Letter." *Ante* at 12. This statement is belied by the record. The analyst specifically considered and rejected Dr. Sutherland's opinion.[6] Moreover, notwithstanding the fact that Dr. Sutherland's letter supports the majority's factual conclusion, it is not entitled to nearly the evidentiary weight that my colleagues give it. *Black & Decker Disability Plan v. Nord*, 123 S. Ct. 1965, 1972 (2003). ("[C]ourts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician. . . .")

The Trustees obviously, and correctly, questioned how Dr. Suther-

---

[6]The paragraph in which the Trustees rejected Dr. Sutherland's opinion reads as follows:

> The records show Mr. Harris sustained a work-related back injury in September 1987. He had treatment over a four-month period with no evidence of an ongoing problem. There are no treatment records after January 8, 1988. . . . Mr. Harris worked until he was laid off on February 13, 1997 with no evidence of an ongoing back problem. The work history and lack of evidence of a back problem would indicate that he was not disabled. Therefore, it would not be reasonable to infer that the back injuries of 1987 and 1996 are related to the disability basis of residuals of traumatic low back injury with radiculopathy in the lower extremities. Although Dr. Sutherland drew a direct relationship between the 1987 injury and the disability of June 21, 1997, the records do not support this conclusion. . . . [Harris] sustained a back injury in June 1997 when he was mowing the lawn. The records show he had treatment thereafter. The records support a conclusion that the disability basis of residuals of traumatic low back injury with radiculopathy in the lower extremities is related to the non-work-related injury of June 1997.

(J.A. at 32.)

land was able, in 2000, to conclude that the 1987 mine accident directly caused Harris's disability in light of the intervening degenerative changes caused by Harris's osteoarthritis and in light of Harris's much more recent back injury. The Trustees' apparent skepticism was undoubtedly reinforced by the fact that Dr. Sutherland never examined Harris in connection with the 1987 mine accident or, indeed, at any time during the nine years after the accident. Moreover, Dr. Sutherland's letter gave no explanation or reasoning as to how he was able to reach his unlikely conclusion. Nevertheless, resolving this factual dispute is not our task. Given the evidence in their possession, the Trustees were clearly entitled to disagree with Dr. Sutherland's opinion, *id.* at 1972, and, while the analyst's written findings might not be a model of explanatory writing, we may not "impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." *Id.*

In my view, both the district court and my colleagues chose to apply the "treating physician rule," which the Supreme Court explicitly rejected just last term. *Id.* at 1972 n.4 ("ERISA does not support judicial imposition of a treating physician rule, whether labeled 'procedural' or 'substantive.'") The treating physician rule, as it had been developed, embodied both "a 'procedural' rule, which require[d] a hearing officer to explain why she rejected the opinions of a treating physician, and a 'substantive' rule, which require[d] that 'more weight' be given to the medical opinions of a treating physician." *Id.* Although the majority opinion explicitly disclaims reliance on the treating physician rule, its holding speaks louder than its disclaimer. *See ante* at 13 ("Because the Trustees ignored Dr. Sutherland's opinion, they failed to properly analyze the proximate cause issue.").

### III.

Because the Trustees' decision that Harris's disability was not caused by a mine accident was supported by substantial evidence, I would reverse the holding of the district court. In my view, my colleagues rely on the now-discredited treating physician rule and ignore the abundant evidence supporting the Trustees' decision. Accordingly, I respectfully dissent.